**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MICHAEL KNEE and ERIC M. MURPHY, on behalf of themselves and those similarly situated, | ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | Case No.13-CV-6337 (JGK) |
| J.P. MORGAN RETIREMENT PLAN SERVICES, LLC; J.P. MORGAN CHASE BANK, N.A.; JPMAC HOLDINGS INC.; J.P. MORGAN CHASE & CO.; AND J.P. MORGAN INVESTMENT MANAGEMENT INC., d/b/a J.P. MORGAN ASSET MANAGEMENT, | ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

## COMPLAINT

Michael Knee and Eric M. Murphy ("Plaintiffs") bring this action against J.P. Morgan Retirement Plan Services LLC, J.P. Morgan Chase Bank, N.A., JPMAC Holdings Inc., J.P. Morgan Chase & Co., and J.P. Morgan Investment Management, Inc., d/b/a J.P. Morgan Asset Management (collectively, "JPM" or the "JPM entities") on behalf of themselves and similarly situated 401(k) plan participants. Based on personal knowledge and information obtained from investigation by counsel, Plaintiffs allege as follows:

## INTRODUCTION

1. This ERISA case concerns some fairly complex retirement plan investment fund structures. Ultimately, though, this case boils down to a simple scheme of self-dealing by one of the world's most powerful investment banks, JP Morgan Chase & Co., and various of its affiliates who are the Defendants here. As explained below, Defendants abused their fiduciary

responsibilities to acquire control from another company of a "stable" retirement fund by first driving it into the ground and then acquiring its asset management and participants at no cost. In a 72-page Arbitration Award against JPM (appended and made a part of this Complaint as Attachment "A") and in favor of that company, American Century Corporation,  the arbitrators found that JPM  had committed the wrongful conduct alleged and awarded American Century in excess of $132 million in damages. (See http://www.bizjournals.com/kansascity/news/2012/03/22/american-century-wins-373m-judgment.html?page=all (last visited Sept. 8, 2013)).  Plaintiffs and the plaintiff class were participants through their several 401(k) plans in American Century's Stable Asset Fund at issue in the arbitration, and, as was American Century, were harmed by JPM's wrongful conduct.

## JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction over this matter pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1331.

3.      Venue is proper in this District because Defendants reside in this District, Defendants conduct business in this District, and the harm complained of herein emanated from this District.

## PARTIES

4.      Plaintiff Michael Knee has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Modern Drop Forge Company Employees' Retirement Benefit Plan (the "Modern Drop Forge Plan").  The Modern Drop Forge Plan is a defined contribution retirement plan that is subject to ERISA.  At all relevant times, Mr. Knee has had 401(k) funds allocated to the American Century Stable Asset Fund ("ACSAF") at the time of the JPM

2

acquisition on  September 14, 2007 and continuing thereafter in what became its successor fund, the Commingled Pension Trust Fund of J.P. Morgan Chase Bank, N.A. (hereafter "Commingled Stable Value Fund").

5.     Plaintiff Eric M. Murphy has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Mayer Electric Supply Co., Inc. Capital Accumulation Plan (the "Mayer Electric Plan"). The Mayer Electric Plan is a defined contribution retirement plan that is subject to ERISA.  Mr. Murphy has had 401(k) funds allocated to ACSAF at the time of the JPM acquisition on September 14, 2007 and continuing thereafter in the Commingled Stable Value Fund.

6.     Plaintiffs Knee and Murphy sue on their own behalf and, as specified below, on behalf of participants in 401(k) plans who have had funds allocated to ACSAF at the time of the JPM acquisition on September 14, 2007 and continuing thereafter in the Commingled Stable Value Fund.

7.     Defendant J.P. Morgan Retirement Plan Services LLC ("JPMRPS") is a wholly-owned subsidiary of defendant J.P. Morgan Chase & Co. ("JPMC").

8.     At all relevant times, JPMC or one of its affiliates has held a significant minority interest in American Century Companies, Inc. ("ACC"), the parent company of American Century Investments ("ACI").

9.     Before JPMC acquired its interest in ACC, ACC had developed a wholly-owned retirement plan recordkeeping service business known as Retirement Plan Services, Inc. ("RPS").  Its subsidiary ACI employed RPS to assist plan sponsors in determining the plan's investment alternatives as well as providing management services needed by employer retirement plan sponsors for their 401(k) retirement plans under ERISA.

10.     By 1998, JPMC or an affiliated entity had acquired a 50% economic interest in RPS from ACC (hereafter collectively "JPM").   Thereafter, JPM shared the cost of operating RPS with ACI/ACC.

11.     Pursuant to an agreement dated June 1, 2003 between ACI and JPM (the "Revenue Sharing Agreement"), JPM acquired ACC's interest in RPS.   (RPS is referred to as "JPMRPS" with regard to the period after JPM's acquisition of 100% of RPS.)    Under the Revenue Sharing Agreement and thereafter, JPMRPS continued to provide services to both JPM and ACI retirement investment product funds and the 401(k) plan sponsors and participants who invested in those funds.   As detailed below, JPMRPS was at all relevant times an ERISA fiduciary to the 401(k) plan sponsors and plaintiff participants invested in ACSAF and its successor, the Commingled Stable Value Fund.   JPM by virtue of its ownership and control of every aspect of JPMRPS was and is also a fiduciary to Plaintiffs under ERISA at least from the date of the Revenue Sharing Agreement.

12.     Defendant JPMC is a financial services provider headquartered in New York, New York. Through defendant JPMAC Holdings Inc. ("JPMAC"), JPMC owned at all relevant times between 40% and 48% interest in ACC.   Throughout the period of its ownership, JPMC and/or JPMAC had the right to appoint and did appoint at least one board member to the ACC Board of Directors, who thus served as a fiduciary of ACC.   In addition, by virtue of their ownership and control of JPRMS, JPMC and/or JPMAC, or both, have been ERISA fiduciaries with regard to those 401(k) plans and plan participants.

13.     Defendant J.P. Morgan Chase Bank, N.A. ("JPMCB, NA") is a bank operating in the United States and abroad with a registered address of 270 Park Avenue, New York, New York 10017-2014. It is a wholly-owned subsidiary of JPMC.   JPMCB, NA, acts as trustee and

4

fiduciary (either directly or through one or more wholly-owned subsidiaries) of JPM's various stable value fund products, including JPM's Commingled Stable Value Fund and its Stable Asset Income Fund ("SAIF"), which are collective trust funds established and maintained by JPMCB, NA, under declarations of trust.  JPMCB, NA, has also been an ERISA fiduciary with respect to 401(k) plan employer-sponsors and plan participants in the Commingled Stable Value Fund from its inception in 2007.

14.     Defendant J.P. Morgan Investment Management, Inc., a.k.a. J.P. Morgan Asset Management ("JPMAM") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017, and is a wholly owned subsidiary of JPMC. JPMAM is the marketing name for the asset management business of JPM and its subsidiaries worldwide.  It manages the Commingled Stable Value and other JPM stable value fund products. As well as being a fiduciary with respect to JPMRPS, JPMAM has been an ERISA fiduciary with respect to the 401(k) plans and their participants who invested in the Commingled Stable Value Fund from its inception.

15.     Collectively, the JPM defendants are referred to as "JPM."  The JPM entities named as defendants are controlled and directed through common and interlocking directors or officers.

## FACTUAL BACKGROUND

16.     Plaintiffs and the proposed plaintiff class are persons who invested part or all of their 401(k) funds in the American Century Stable Asset Fund ("ACSAF") and at the time of JPM's acquisition on September 14, 2007.  At that time,  JPM caused the ACSAF to be merged into the Commingled Pension Trust Fund (Stable Value) of JPMorgan Chase Bank, N.A ("Commingled Stable Value Fund") or otherwise to cease to exist, with all its assets and

participants/investors at that time being transferred to the Commingled Stable Value Fund. By virtue of JPM's acquisition of the ACSAF, Plaintiffs and the proposed plaintiff class became involuntary investors in its successor fund, the Commingled Stable Value Fund.

17.     A "stable value fund" is a common investment option offered to 401(k) plan participants. It is offered often as an alternative to a money market fund investment option, as it ostensibly provides security of principal, liquidity and a small potential added return above what money market funds offer. Often the stable value fund serves as the default investment option in 401(k) plans, such that, if an employee does not affirmatively designate an investment option, the employee's 401(k) funds will automatically be placed in the stable value fund option.

18.     Since at least the late 1990s, JPM and ACI (and related entities of JPM and ACI) had been business partners that together promoted retirement plan investment funds. In addition to co-owning RPS, they both operated stable value funds and recognized at the outset of their business together that their stable value funds should not compete against each other for the same investment dollars.

19.     Stable value funds must trade at the value at which the fund is carried on the bank's balance sheet ("book value"), and a competition for yield in a down market can leave a stable value fund in a liquidity crunch, with the fund required to sell depressed assets to meet redemption demands by participating retirement plans and/or their individual plan participants, which must be paid at book value.

20.     Sometime in the 1990s, ACC created a wholly-owned subsidiary of ACI known as Retirement Plan Services, Inc. ("RPS"). RPS provided various services to sponsors of 401(k) plans ("the employers") and their plan participants. In this capacity, on behalf of and for 401(k) plan sponsors, RPS reviewed retirement plan investment funds available in the marketplace and

proposed to these retirement plan sponsors a suggested lineup of investment options from which their employees-plan participants could choose in investing their 401(k) monies. RPS also provided substantial administrative services to ACSAF. (These investment, management and administrative services are detailed in the Arbitration Award, attached and made a part of this Complaint as Attachment A). ACSAF was among the funds that RPS proposed to plans, including the Modern Drop Forge and Mayer Electric 401(k) plans in which Plaintiffs were participants and which thereafter offered ACSAF as an investment alternative.

21.    ACI used RPS as a significant distribution channel to sell its own investment funds in the retirement investment market. These ACI funds were in essence "house brands," known as "proprietary funds," and they were given preferential placement by RPS in the investment lineups that RPS proposed to 401(k) sponsors.

22.    Beginning on January 15, 1998, and continuing thereafter, JPM acquired and owned a substantial but not majority interest in ACC. On several occasions, it sought to buy a majority interest in ACC, but was rebuffed by ACI on the basis of price. In 1998, JPM acquired a 50% interest in RPS from ACC/ACI and agreed to bear one-half of the costs of operating RPS. In return, JPM obtained the opportunity to have its proprietary JPM funds marketed through RPS and given the same preferential placement as ACI funds in investment lineups proposed to plan sponsors by RPS.

23.    As part of this 1998 agreement, JPM and ACI agreed that there would only be one stable value fund product offered by RPS to a plan sponsor. Per agreement, the stable value fund product to be offered would be determined by the size of the plan. Thus, they agreed that RPS would offer JPM's stable value funds only to larger employer plans holding $50 million or more

in assets, and RPS would offer ACI's stable value funds only to plans holding less than $50 million in assets.

24.     The larger plans' stable value fund investments were held in JPMAM "separate accounts," managed by JPM and invested in JPM stable value funds on a plan sponsor-specific basis.  The investment agreements between JPM and the retirement plan sponsors involved here and the investments of such funds were substantially identical. The smaller accounts were invested in ACSAF.   JPM and ACI received the revenue and profits from the funds they respectively managed.  Both the JPM separate account and the ACSAF were treated by RPS as proprietary in that RPS would not and did not offer any third-party stable value funds to retirement plan sponsors as part of suggested 401(k) plan investment option lineups.  That is, JPM and ACI agreed to split and allocate the sole stable value fund slot in the RPS retirement plan fund lineup on the above-described basis.

25.     In 2003, JPM and ACC entered into the Revenue Sharing Agreement. In this agreement, JPM acquired the remaining 50% of RPS from ACI.  (RPS thereafter is referred to herein as "JPMRPS.") JPM agreed in the Revenue Sharing Agreement that it would maintain the status quo as to existing ACI stable value fund sponsors and not attempt to lure them away from ACSAF into any JPM stable value fund.  In furtherance of this obligation, JPM was obliged both directly and through RPS to (a) offer the same preferential treatment to ACI investment products (including ACSAF) as RPS had previously offered, (b) provide the same level of marketing and sales support to ACI investment products as were offered to JPM products, and (c) establish a compensation structure substantially the same for both ACI and JPM stable value products.  In return, JPM was permitted to offer its own JPM stable value funds to plans with less than $50

million in assets that were not already invested in ACSAF.   In addition, JPM agreed to pay ACI a multi-year commission on sales of ACI products sold through RPS.

26.     Before and after execution of the Revenue Sharing Agreement, JPM attempted to purchase ACSAF from ACI.  These efforts were rebuffed. JPM then embarked on a plan to use JPMRPS (now a wholly owned JPM subsidiary) to enfeeble the ACSAF to the extent that not only would ACSAF not be able to compete with the JPM stable value funds, but it would not be able to survive at all as an independent, non-JPM entity.

27.     In support of this plan, and despite its contractual commitment to manage ACSAF in such a manner as not to impair ACI's future revenues, JPMRPS embarked on a course of conduct in which it wrongfully lured and enticed ACSAF plan sponsors away from the ACSAF and into JPM's Commingled Stable Value Asset Income Fund as well as into JPM's separate Stable Value Funds. Throughout this course of conduct, JPM and JPMRPS knew full well that such conduct would damage ACSAF and investors in it like Plaintiffs.

28.     Thus, JPMRPS, through its actions, was able to influence, manage and control fund selection for 401(k) plans and participants invested in ACSAF and move many plan sponsors to JPM's Stable Value Funds.  Ultimately, ACSAF was so totally decimated by JPM's conduct that it was no longer economically viable for ACSAF to exist at all, and JPM caused what remained of that fund to be merged or otherwise become part of the Commingled Stable Value Fund on September 14, 2007.

29.     RPS, both before and after JPM's acquisition of 100% ownership, and JPM by virtue of its ownership and control of JPMRPS, were and are fiduciaries to Plaintiffs and the proposed plaintiff class and the plans in which they participated in that, among other things, they provided  investment  management  services  and  discretionary  administrative  authority  and

responsibilities with regard to management of ACSAF, both up to and after it became part of the Commingled Stable Value Fund.  Moreover, one or more of the JPM entities were and are fiduciaries as trustees and custodians with respect to the Commingled Stable Value Fund and other JPM stable value funds pursuant to ERISA § 403(a), 29 U.S.C. § 1103(a), and are also fiduciaries as investment managers with respect to these funds in that they provided investment, trust and administrative services to these funds.   The actions of JPMRPS and the related JPM entities constitute a breach of fiduciary duty to Plaintiffs and the proposed class in violation of ERISA sections 404 and 409, 29 U.S.C. §§ 1104 and 1109, and directly and proximately caused economic losses to Plaintiffs and the proposed class.

30.     As noted above, throughout this period JPM desired to acquire the shares of ACI, but it and ACC could not agree on price.  Because the price of ACI was driven to a large extent by the amount of assets ACI had under management and the performance of the fund at issue here, JPM knew that the amount it would need to pay for the ACI funds decreased as the assets under ACI management decreased.  In addition, to the extent JPM was able to use RPS and JPMAM to induce plan sponsors to leave ACSAF in favor of JPM Stable Value Funds, JPM's assets under management and consequent fees would increase.  Thus, JPM's conduct served both to decrease the purchase price of ACI's Stable Asset Fund and concurrently increase its own revenues.  JPM's efforts on this score ultimately succeeded, as the assets under management in ACSAF and the number of 401(k) plans offering ACSAF as a 401(k) plan investment option substantially decreased after the date of the Revenue Sharing Agreement and JPM's acquisition of 100% of RPS.

31.     At the time of the Revenue Sharing Agreement in 2003, JPM did not have a pooled stable value fund with which to compete with ACSAF.  In 2004, JPM, as part of its

acquisition of Bank One, acquired Bank One's Stable Asset Income Fund ("SAIF"). This fund, which became JPM's Stable Asset Income Fund, was a pooled stable value fund which like ACSAF targeted 401(k) plans with less than $50 million in assets – in other words, the very same market on which ACSAF was focused. This acquisition allowed JPM to offer a product through JPMRPS that competed directly with ACSAF.

32.     Thereafter, JPM, through its wholly owned subsidiaries JPMRPS and JPMAM, embarked on a campaign to induce plan sponsors that had offered the ACSAF to switch to the competing JPM's Stable Asset Investment Fund and, if large enough, to its separate JPM Stable Value Funds. This strategic cannibalization of ACSAF enabled JPM to acquire ACSAF at the lowest possible price and to minimize the commissions due ACI incident to that acquisition under the Revenue Agreement and thereby increase JPM's revenues.

33.     With the acquisition of Bank One's SAIF, JPM actively pursued existing ACSAF sponsors to switch to its fund. Thus, in December 2004, JPMRPS' chief financial officer, Mary J. Block, stated that "JPM/ I want to replace all ACI with JPM Stable Value . . . ." As early as June 2004, JPMRPS employee Paul Shahrocki had written that the takeover of RPS and the availability of the Bank One SAIF would be the "end" of ACSAF.

34.     To further achieve this aim, JPM systematically used the newly acquired Stable Asset Income Fund ("SAIF") to steer current ACI plan sponsor clients away from ACSAF and into JPM's competing SAIF. Acknowledging this plan, the co-head of JPMRPS's Strategic Relationship wrote in late 2004 or early 2005 that "we are on officially the path to moving clients from ACI to JPM stable value, w/priority on larger accounts."

35.     Almost from the inception of the Revenue Sharing Agreement in September 2003, JPMRPS and JPM offered substantial rewards to JPMRPS employees for promoting JPM stable

value funds to the detriment of ACSAF and participants who invested in it. For example, JPMRPS employees were informed that their compensation opportunities were greater for sales and promotion of JPM's stable value fund than ACSAF.  Also, JPMRPS gave JPM's stable value funds the exclusive opportunity to compete with third party funds, a role previously occupied solely by ACI's funds.

36.     Despite their understanding of the duties of a fiduciary under ERISA, the JPM entities induced, encouraged and caused JPMRPS to imprudently and in violation of their fiduciary duties of loyalty and candor engage in the above-described scheme.  Thus, beginning in the fall of 2003 and continuing to the fall of 2007, JPM engaged in concert with fiduciary JPMRPS in intentional efforts to damage ACSAF as described above to benefit JPM, JPMAM's profits and JPM stable value products.  JPM's personnel assisted and caused JPMRPS to act in derogation of their fiduciary obligations to American Century Stable Value participants including Plaintiffs and the plaintiff class by influencing ACSAF's plan sponsor and participant decisions on fund selection for JPM's own financial interest, rather than the best interest of ACSAF plan participants, in order to reap greater financial rewards for themselves.

37.     The JPM entities profited from their knowing participation in JPMRPS's fiduciary breaches, extracting the profits associated with being the provider of services under the plans and plan managers of the successor stable value fund and other stable value clients who were placed after being moved away from ACSAF.

38.     As a result of this campaign by JPM, the assets under management by ACI in its Stable Value Fund substantially decreased. Ultimately, ACI determined that it was no longer viable to maintain its Stable Value Fund as a separate entity and in September 2007 transferred the Fund's assets to the new JPM entity, the Commingled Stable Value Fund, which JPM has

managed thereafter.  ACSAF was so depleted by that point that ACI received no compensation from JPM from the transfer.

39.     The mass exodus of plan participants, and plan assets from ACSAF, all of which was as required at book value, caused the market value of that fund to decrease so that as of September 14, 2007 it was further below book value than otherwise, to the loss and detriment of Plaintiffs and the proposed plaintiff class.  Plaintiffs and the plaintiff class were further injured by the loss and detriment associated with the poor performance of JPM's Commingled Stable Value Fund thereafter. That is, if ACI's Stable Value Fund had remained in business, managed by ACI on the same principles as were in place prior to the transfer to JPM's fund, Plaintiffs allege on information and belief that they and the plaintiff class would have fared far better than they actually did after the involuntary transfer to JPM's Commingled Stable Value Fund.

40.     In contrast, by virtue of its wrongful conduct, as confirmed by the Arbitration Award, Defendants obtained substantial profits and fees by their wrongdoing, which should be disgorged.

41.     In July 2009, ACI initiated arbitration proceedings against JPMRPS and related entities. *Am. Century Inv. Mgmt., Inc. v. J.P. Morgan Invest Holdings LLC,* No. 58 148 Y 00220 9 (Am. Arb. Ass'n).  In the arbitration complaint, ACI alleged that in violation of the Revenue Sharing Agreement and in bad faith, JPM embarked on a successful plan to (1) take over American Century's Stable Value accounts to decrease ACSAF's value for ultimate acquisition, (2) increase JPM assets under management and resulting fees to JPM entities, and (3) decrease the amounts due to ACI under the Revenue Agreement.

42.     In its 72-page Award dated August 10, 2011, the arbitrators sustained ACI's claim and awarded it $128,297,668 plus interest in the amount of $4,334,000, for a total award of

$132,631,688, for JPM's breach of the Revenue Sharing Agreement.  *See Arbitration Award,* Attachment A. The Award and the facts on which it is based remained under seal until March 2012.

## ERISA REQUIREMENTS

43.     ERISA sections 404(a)(1)(A), (B), and (C) provide in relevant part that "a fiduciary shall discharge its duties with respect to a plan solely in the interests of the participants and beneficiaries" and must (A) act "for the exclusive purpose of providing benefits to participants and their beneficiaries"; (B) act with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims"; and (3) "diversify[] the investments of the plan so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so."

44.     These fiduciary duties are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).

45.     Fiduciary duties under ERISA section 404 include, among others:

(A)     The duty to act exclusively in the best interest of the plans, their participants, and their beneficiaries.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

(B)     The duty to disclose and inform, which encompasses a negative duty not to misinform; an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and an affirmative duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

(C)     The duty to avoid conflicts of interest; and should such conflicts occur, the duty to resolve them promptly.

(D)     The duty to conduct an independent, thorough, and honest investigation into, and to continually monitor, the merits of all the investments of a plan.

(E)     The duty to diversify sufficiently the investment portfolio of the plan.

46.     ERISA sections 406(a) and (b), in relevant part, prohibit a fiduciary both directly and indirectly as a party in interest from participation in certain identified transactions with a plan for which it serves as a fiduciary.  Thus, section 406(a) provides that a fiduciary shall not cause a plan to engage in a transaction if he knew or should have known that such transaction was directly or indirectly a sale or exchange between the plan and the fiduciary, or a transfer to or use by a fiduciary of any assets of the plan, or furnishing any goods or services to the plan. Similarly, section 406(b) prohibits a fiduciary from dealing with any assets of the plan in his own interest or account, or from acting for any person whose interests are adverse to the plan or receiving any consideration for his own account from any person dealing with the plan.

## CLASS ALLEGATIONS

47.     *Class Definition*.  Plaintiffs bring this matter as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3).  Plaintiffs file this case on behalf of the following proposed class:

> All participants of ERISA plans, as well as beneficiaries of those plans, who were invested directly or indirectly in the American Century Stable Asset Fund immediately before and continuing after JPMAM took over the Fund and transferred its assets to JPM's Commingled Stable Value Fund on or about September 14, 2007. Excluded from the Class are the jurists to whom this case is assigned, as well as their respective staffs; counsel who appear in this case, as well as their respective staffs, including experts they employ; the Defendants in this matter, as well as their officers and directors; any person, firm, trust, corporation, officer, director, or other individual or entity in which a Defendant has a controlling interest or that is related to or affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

48.     *Numerosity*.   The members of this Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiffs at this time, and can be ascertained only through discovery, Plaintiffs reasonably believe that more than 80 ERISA plans throughout the country offered ACSAF and JPM's successor plan, Commingled Stable Value Fund, during the Class Period.   These Plans collectively have many thousands of participants and beneficiaries, and Plaintiffs believe that a substantial number of these persons had invested in ACSAF and JPM's successor to ACSAF, the Commingled Stable Value Fund.

49.     *Commonality*.   The claims of Plaintiffs and the proposed Class have a common origin and share a common basis.   All Class members suffered from the same misconduct complained of herein, and they all suffered injury as a result of the breaches of duties and violations of ERISA that form the basis of this lawsuit.   Proceeding as a class is particularly appropriate here because the ACSAF's assets were held in a collective trust while at ACI and were subsequently transferred together when JPM took the fund over in 2007.   Furthermore, common questions of law and fact exist as to all members of the Class.   The many questions of law and fact common to the Class include, but are not limited to:

a.      whether JPMRPS and any of the other JPM affiliates are fiduciaries under ERISA with respect to the conduct here alleged;

b.      whether JPMRPS and any of the other JPM affiliates breached fiduciary duties under ERISA by virtue of this conduct;

c.      whether any of the transactions by JPMRPS and other JPM defendants were prohibited transactions; and

d.      whether JPM's actions complained of herein have injured plan participants and their beneficiaries who were invested in ACSAF.

50.     *Typicality*.  Plaintiffs' claims are typical of the claims of the members of the Class because they are substantively identical to the claims of the Class members.  All Class members were investors in the same fund, the ACI Stable Asset Fund at the time its assets were acquired by JPM and all became investors in JPM's successor fund, its Commingled Stable Value Fund. If each member of the Class were to bring and prosecute these claims individually, each member of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

51.     *Adequacy*.  Plaintiffs will fairly and adequately protect the interests of the Class members.  Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the Class members.  Plaintiffs will vigorously protect the interests of the members of the Class.

52.     Moreover, Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters.  Such counsel have been appointed as Lead Counsel and Interim Class Counsel in numerous class action lawsuits.  The undersigned counsel will devote the time and other resources necessary to litigate this case as effectively as possible.

53.     *Rule 23(b)(1)(A) and (B) requirements*.  Class certification in this ERISA action is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for JPM.  Certification also is warranted under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by individual Class members would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

54.    ***Rule 23(b)(2) requirements***.  Class certification under Federal Rule of Civil Procedure 23(b)(2) is warranted because JPM has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole.

55.    ***Rule 23(b)(3) requirements***.  In the alternative, certification under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members of the Class predominate over any questions (if any) affecting only individual Class members.  Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I: BREACH OF FIDUCIARY DUTY, VIOLATION OF ERISA § 404(a)(1)(A) EXCLUSIVE BENEFIT

56.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

57.    JPMRPS, JPMC and other JPM affiliates were fiduciaries, as discussed above, for the plans offering the American Century Stable Asset Fund and plan participants, including Plaintiffs and the proposed Class since at least 1999. ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires fiduciaries to discharge their duties solely in the interest of participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.

58.    Despite the prohibition of ERISA Section 404(a)(1), as well as Section 406(1)(A), these JPM Defendants, while fiduciaries, caused a mass exit from ACSAF until it was no longer a viable independent fund, and then caused American Century to transfer the assets, plans and participants in its Stable Value Fund to JPM and its Commingled Stable Value Fund for no consideration.

59.     JPMRPS' and JPMC's aforementioned actions were not in the best interest of the American Century Stable Asset Fund's participants and beneficiaries. Rather, JPMRPS and JPMC sought to cannibalize ACSAF with the purpose and result of rendering the ACSAF no longer able to operate as an independent entity. As a result, Plaintiffs and the plaintiff Class found themselves involuntary participant in JPM's Commingled Stable Value Fund.

60.     JPMRPS and JPMC breached this duty of loyalty to plan sponsors and plan participants who were invested in the American Century Stable Asset Fund by actively inducing plan sponsors to leave the American Century fund in favor of JPM's competing Stable Asset Income Fund and then causing the American Century fund to be no longer viable and causing its participants and assets to be transferred to the Commingled Stable Value Fund.

61.     As a result of this wrongdoing, JPMRPS and JPMC are liable for all resulting loss and damage to the plans, to plaintiffs and the plaintiff class.  JPMRPS and JPMC must also disgorge all monies they wrongfully made through use of the plans' assets.

## COUNT II: BREACH OF FIDUCIARY DUTY, VIOLATION OF ERISA § 404(a)(1)(B) DUTY OF LOYALTY

62.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

63.     JPMRPS, JPMC and other JPM affiliates were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class, who had been invested in American Century's Stable Asset Fund and were so invested when it was acquired by JPM.

64.     A fiduciary has a duty of loyalty under ERISA sections 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).   The JPM defendants breached this duty of loyalty by the conduct alleged above. JPMRPS' and JPMC's actions directly and proximately caused

19

substantial financial harm to Plaintiffs and the proposed Class and earned wrongful profits.  As a result of this wrongdoing, JPMRPS and JPMC are liable for all resulting loss and damage to the plans, to Plaintiffs and the proposed plaintiff class.  JPMRPS and JPMC must also disgorge all monies they wrongfully made through use of the plans' assets.

## COUNT III: KNOWING PARTICIPATION IN A BREACH OF FIDUCIARY DUTY

65.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

66.     To the extent they are not otherwise fiduciaries with regard to the conduct here alleged, the JPM Defendants other than JPMRPS and JPMC are liable under ERISA section 405(a), 29 U.S.C. § 1105(a), to Plaintiffs and the Class for all recoverable damage and relief as non-fiduciaries that knowingly participated with fiduciary JPMRPS and JPMC in their breaches of trust.

67.     The JPM Defendants', other than JPMRPS and JPMC, acts and omissions proximately caused substantial harm to Plaintiffs and the proposed class.  As a result of their wrongdoing, each is liable for all resulting loss and damage.  These defendants must also disgorge all monies made through wrongful use of the plans' assets.

## COUNT IV: VIOLATON OF ERISA §§ 406(a)(1)(A) AND (a)(1)(D) PROHIBITED TRANSACTIONS

68.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

69.     JPMRPS, JPMC and other JPM entities were fiduciaries, as discussed above, for ACSAF and for the 401(k) plans and plans' sponsors and plan participants to whom they

provided investment advice and services and to successor Commingled Stable Value Fund and their plan sponsors and participants, including Plaintiffs and the proposed Class.

70.     The Defendants other than JPMRPS and JPMC are parties in interest pursuant to ERISA section 3, 29 U.S.C. § 1002, in that they were either fiduciaries of the plans or provided services to the plans.

71.     In violation of section 406(a)(1)(A), JPMRPS and JPMC caused the plans to sell property to one or more of these parties in interest in that they caused the plans to transfer to these parties the assets of the plans invested in the ACSAF and caused the plans to transfer to these parties in interest the management of such assets.

72.     In addition, in violation of section 406(a)(1)(D), JPMRPS and JPMC caused the plans to transfer to or use by or for the benefit of one or more of these parties in interest assets of the plans.

73.     JPMRPS' and JPMC's actions caused substantial financial harm to Plaintiffs and the proposed Class.  As a result of this wrongdoing, JPMRPS and JPMC are liable for all resulting loss and damage.  JPMRPS and JPMC must also disgorge all monies they wrongfully made through use of the plans' assets.

## COUNT V: VIOLATION OF ERISA §§ 406(b)(1),  (b)(2)  AND (b)(3) PROHIBITED TRANSACTIONS

74.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

75.     JPMRPS, JPMC and other JPM affiliates were fiduciaries, as discussed above, for ACSAF and successor Commingled Stable Value Fund and their plan sponsors and participants, including Plaintiffs and the proposed Class.

76.     ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

77.     In violation of ERISA section 406(b)(1), 29 U.S.C § 1160(b) (1), JPMRPS and JPMC dealt with the assets of the plans in their own interest and for their own accounts by causing the plan assets to be transferred to another JPM Defendant, either a parent or co-subsidiary.

78.     In addition in violation of ERISA section 406(b)(2), they acted in transactions involving the plans on behalf of other JPM defendants whose interests were adverse to the interests of the plans and their participants in that they caused ACSAF no longer to be viable as an investment option for 401(k) plans so that its assets and participants would be transferred to JPM's successor Commingled Stable Value Fund.

79.     In addition, in violation of ERISA section 406(b)(3), 29 U.S.C. § 1106(b)(3), JPMRPS and JPMC received consideration for their own personal accounts in connection with influencing, managing and controlling fund selection for ACSAF plans they represented to the detriment of the remaining plan participants in the successor fund, the Commingled Stable Value Fund, and to increase their own revenues.

80.     The actions of JPMRPS and JPMC caused substantial financial harm to Plaintiffs and the proposed Class.  As a result of this wrongdoing, JPMRPS and JPMC are liable for all resulting loss and damage to the plans, the plaintiffs and the plaintiff class.  JPMRPS and JPMC must also disgorge all monies made through wrongful use of the plans' assets.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

A.      A determination that this action is a proper class action and certification of the proposed Class, with Plaintiffs as class representative and its counsel as Class Counsel, pursuant to Federal Rule of Civil Procedure 23;

B.      A declaration that the Defendants, and each of them, have breached their ERISA duties to the Plaintiffs and the Class;

C.      An order compelling the Defendants to make good to the Plaintiffs, the Class, and their plans the losses resulting from Defendants' breaches of their fiduciary duties;

D.      An order compelling the Defendants to disgorge all monies they have made by virtue of the actions alleged above to be allocated among the participants' individual accounts within the plans in proportion to the accounts' losses;

E.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plaintiffs, the Class and their plans as a result of the aforementioned ERISA violations to be allocated among the participants' individual accounts within the plans in proportion to the accounts' losses;

F.      An order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the relevant ERISA plans' funds;

G.      An amount equal to the amount of any losses to the Plaintiffs, the Class, and the ERISA plans included in the Class to be allocated among the participants' individual accounts within the plans in proportion to the accounts' losses;

H.      An award of costs pursuant to 29 U.S.C. § 1132(g);

I.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and other law;

J.      An award for equitable restitution and other appropriate equitable and injunctive relief against the Defendants; and

K.      An award of such other and further relief as the Court deems just and proper.


Dated: September 10, 2013                    Respectfully submitted,

                                             Kevin Madonna /s/

Kevin Madonna (Bar No. KM5595)              Thomas R. Meites, Esq.
KENNEDY & MADONNA, LLP                      Michael M. Mulder, Esq.
48 Dewitt Mills Rd.                         Elena N. Liveris, Esq.
Hurley, New York 12443                      MEITES MULDER
Tel: 845-481-2622                           321 S. Plymouth Ct., Ste. 1250
Fax: 845-230-3111                           Chicago, Illinois 60604
                                            Tel: 312-263-0272
                                            Fax: 312-263-2942
                                            trmeites@meitesmulder.com
                                            mmmulder@meitesmulder.com
                                            eliveris@meitesmulder.com
                                            *Appearing pro hac vice*

Garrett W. Wotkyns, Esq.                    Jason Kim
SCHNEIDER WALLACE COTTRELL                  SCHNEIDER WALLACE COTTRELL
KONECKY LLP                                 KONECKY LLP
8501 N. Scottsdale Road, Suite 270         180 Montgomery Street, Suite 2000
Scottsdale, Arizona 85253                   San Francisco, California 94104
Tel: (480) 428-0144                         Tel: (415) 421-7100
Fax: (866) 505-8036                         Fax: (415) 421-7105
gwotkyns@schneiderwallace.com              jkim@schneiderwallace.com
*Appearing pro hac vice*                    *Appearing pro hac vice*

Joseph Peiffer, Esq.                        Peter Mougey, Esq.
FISHMAN HAYGOOD PHELPS                      Laura Dunning, Esq.
WALMSLEY WILLIS & SWANSON, LLP              LEVIN PAPANTONIO THOMAS
201 St. Charles Avenue, Suite 4600         MITCHELL RAFFERTY & PROCTOR, P.A.
New Orleans, Louisiana 70170               316 So. Baylen Street, Suite 600
Tel: (504) 586-5252                         Pensacola, FL 32502
Fax: (504) 586-5250                         pmougey@levinlaw.com
jpeiffer@fishmanhaygood.com                ldunning@levinlaw.com
*Appearing pro hac vice*                    *Appearing pro hac vice*


ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS