## EXHIBIT 3

American Arbitration Association

| | |
|---|---|
| AMERICAN CENTURY INVESTMENT ) | |
| MANAGEMENT, INC., ) | |
|  Claimant, ) | |
|  ) | |
| v. ) | Case No. 58 148 Y 00220 09 |
|  ) | |
| J.P. MORGAN INVEST HOLDINGS LLC, ) | |
| f/k/a J.P. MORGAN INVEST, INC., ) | |
|  Respondent. ) | |
|  ) | |

### AWARD OF ARBITRATORS

We, the undersigned Panel of Arbitrators (the "Panel"), having been designated in accordance with the arbitration agreement that is Article IV of the Partial Settlement Agreement, Mutual Release of Certain Claims and Agreement to Arbitrate Remaining Claims dated as of July 29, 2009 ("PSA") between and among American Century Companies, Inc. ("ACC"), Claimant American Century Investment Management, Inc. ("ACI"), Respondent J.P. Morgan Invest Holdings LLC ("JPM"), J.P. Morgan Retirement Plan Services LLC ("RPS"), JPMorgan Asset Management Holdings Inc. ("JPMAM"), JPMorgan Chase & Co., a Delaware corporation ("JPMC"), JPMAC Holdings Inc. ("JPMAC"), and James E. Staley ("Mr. Staley") (JPM, RPS, JPMAM, JPMC, and Mr. Staley collectively were referenced in the PSA as the "JPM Defendants" and, where the phrase ""JPM Defendants" is used herein below, it refers to those parties to the PSA collectively), and its Arbitration Protocol ("Protocol") that is Exhibit G to the PSA detailing and providing structure to the process under which the agreed arbitration was to be conducted (the PSA with all its exhibits being EX. 2284 in evidence in this

Case), having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby AWARD as follows:

FINDINGS AND CONCLUSIONS

BACKGROUND OF THE CASE PROCEEDINGS

1. This contract dispute (the "Case") was filed by ACI before the American Arbitration Association in 2009 and assigned Case No. 58 148 Y 00220 09. This Case requires the Panel to interpret two related contracts. The hearings in this Case commenced on February 14, 2011, and the evidentiary portion of the hearings was held in Kansas City, MO from February 14-March 23, 2011. In addition to the PSA, the primary contract at issue herein is a contract titled "Revenue Agreement" dated as of June 1, 2003 (EX. 0001) ("Revenue Agreement") between Claimant ACI and J.P. Morgan Invest, Inc., now known as Respondent JPM and referenced in the Revenue Agreement as "JPM."

2. In advance of the hearing, the parties agreed to and did submit to the Panel four documents titled "Jointly Submitted List of Key ACIM and JPM Current and Former Employees ("Key Employees List")," "Glossary of Key Terms ("Glossary")," "Jointly Submitted Chronology of ACI's Claim," and "Jointly Submitted Chronology of JPM's Counterclaim." Approximately 600 exhibits were accepted into evidence. Almost 50 different individuals testified in person, by videotaped testimony, or by both. All references to exhibits or testimony cited in this Award refer to evidence introduced during the hearing. Terms are used herein as defined in the parties' Glossary, unless otherwise noted, and any references to witnesses' employment histories may be based on the Key Employees List as well as on the evidence submitted during the evidentiary

2

hearing. All testimony, documentary evidence admitted during the evidentiary hearing, and witness demeanor have been duly considered by the Panel in its decision and in rendering this Award. This Award is based on the totality of evidence introduced at the evidentiary hearing, given appropriate weight, and reasonable inferences therefrom. The majority of the voluminous evidence on which the Panel's findings and conclusions and this Award are based is not specifically referenced herein. Therefore, evidence cited in this Award is illustrative of the totality of evidence introduced whose weight underlies the findings and conclusions herein. Any references to specific evidence in this Award is not to be construed as reflecting the sole or even the most significant evidence supporting a finding or conclusion. Because of the volume of evidence, this Award summarily explains some but not all of the Panel's analysis.

3. Notwithstanding that all the JPM Defendants are party to and are bound by the PSA and its arbitration agreement, only JPM was named as respondent in this Case, consistent with the PSA as executed, as discussed below.

4. Respondent JPM filed a Motion for Partial Summary Judgment in this case in 2010. In December 2010, in denying Respondent's Motion for Partial Summary Judgment, the Panel issued an order that stated:

The parties shall be permitted to introduce at the hearing of this Case evidence regarding the parties' intent and understanding of the phrase "Excluded Damages" as set forth on page 2 of the Partial Settlement Agreement, Mutual Release of Certain Claims and Agreement to Arbitrate Remaining Claims of the parties at issue in this Case. Such evidence may be given such weight as the Panel deems appropriate under the totality of evidence to be presented.

5. This Case went to hearing on ACI's First Amended Arbitration Claim dated on or about July 19, 2010; JPM's Amended Counterclaim for Breach of Contract dated on or about July 19, 2010; JPM's General Response to the First Amended Arbitration Claim dated August 30, 2010; and ACI's Response to JPM's Amended Counterclaim for Breach of Contract dated August 30, 2010. The First Amended Arbitration Claim asserts two counts for relief: Count I for "Breach of Contract" and Count II for "Breach of Contract - Implied Duty of Good Faith and Fair Dealing." JPM's Amended Counterclaim asserts one cause of action for breach of contract.

6. The Protocol provides the structural and procedural detail for the conduct of this Case. For example, procedural matters such as the merits hearing schedule, a schedule for telephonic pre-hearing conferences with the Panel Chair, application of the Federal Rules of Evidence to the hearing of this Case, and similar matters were structured in the Protocol.

7. The Panel requested the parties submit for consideration their proposed awards that complied with the requirements of the Protocol's paragraph 5: "The Arbitrators shall issue a reasoned award which shall contain a concise statement of the facts and law which support the final award." Consistent with the parties' understanding of their Protocol's requirements, Claimant timely submitted a proposed award of approximately 15 pages in length and Respondent timely submitted a proposed award of 18 pages in length. The Panel finds and concludes that this Panel's Award is consistent with the

scope of reasoning and detail intended by the parties for an award under the PSA and its Protocol, as evidenced by their submissions.

8. In its "Respondent's Proposed Reasoned Award" submitted on May 31, 2011, JPM conceded in proposed finding and/or conclusion 21 that it had breached the Revenue Agreement relating to the placement of ACI's LiveStrong "age-based" retirement fund product vis-à-vis JPMAM's SmartRetirement "age based" retirement fund product. It had made this same concession in its post-hearing brief submitted on May 15, 2011. The Panel accepts these concessions of Respondent and accepts the following language from Respondent's Proposed Reasoned Award as binding admissions by JPM and as findings and/or conclusions of the Panel:

Turning to the question of performance, the evidence offered at the hearing establishes, and JPMI has conceded, that RPS did not in all instances provide ACI's Livestrong products the same preferential placement that it provided to JPMAM's SmartRetirement products and that RPS in many instances advised plan sponsors to substitute ACI's Strategic Allocation funds with target-date funds without presenting the Livestrong funds as a potential alternative. Beginning in approximately June 2006, when JPMAM's SmartRetirement suite of funds were first distributed at RPS, RPS failed to position Livestrong in RFPs despite the fact that Livestrong had passed RPS's screening criteria and was on the Focus List. The evidence also established, and JPMI has conceded, that when recommending to clients that they consider moving from risk-based funds to target-date funds, RPS did not position the Livestrong funds as a potential alternative but that it did for SmartRetirement.

*See* Respondent's Proposed Reasoned Award at paragraph 21. The Panel's acceptance of JPM's proposed language in no way constitutes a limitation on the Panel's findings and conclusions of temporal scope or of breadth of the admitted breach, or of the damages or appropriate remedy for breach that the Panel determines below.

FACTUAL BACKGROUND OF THE CASE

9. ACC's and ACI's historical business is the development and management of managed collective or "pooled" investment funds through which individual investors hope to increase their wealth.

10. As of January 15, 1998, pursuant to a Stockholders Agreement (EX. 0004), JPMAC, a wholly-owned investor subsidiary of JPMC, became a substantial shareholder in ACC, the parent of Claimant ACI, but without sufficient shareholdings to become the controlling shareholder of ACC. From that time through conclusion of the hearing, JPMC through JPMAC has owned or controlled a significant interest but never a controlling interest in ACC, specifically, no less than 40% and no more than 48%. As a result of this ownership interest, at all relevant times, JPMC and/or JPMAC had the right to appoint at least one Board member to the ACC Board of Directors, who thus served as a fiduciary of ACC. Ex. 0004, Section 2.1(a) and (e). JPMC and ACC had a shared vision for their relationship focused around retirement plan administration and product offerings to be built through their "'shoulder-to-shoulder' partnership" described in more detail in Appendix A to EX. 0004. At the "core of the reason for JPMorgan's relationship with ACI, and basis for the purchase of the 45% of ACI" was JPMC's desire to "gain access to the defined contribution channel through a jointly owned record-keeper (RPS)." *See* EX. 27.

6

11. For most if not all of the time relevant to this Case, Mr. Staley served as JPMC's designee on ACC's Board. *See* Key Employees List. During his tenure as an ACC Board member, Mr. Staley occasionally brought with him to ACC Board meetings a senior executive connected to JPMC named Eve (Evelyn) Guernsey, who retired from JPMC shortly before the beginning of the Case's hearing and testified by videotape at the hearing. From 2001 through September 2009, Mr. Staley was Chief Executive Officer of JPMAM, which is the JPMC entity that offers retirement and other investment products for sale to the public (in certain respects similar to the offerings of ACI) using various monikers including "JP Morgan Fleming" (referenced in various exhibits as "JPMF"), and thereafter was promoted to Chief Executive Officer of J.P. Morgan Investment Bank. As evidenced by the testimony, EX. 2306, and the Key Employees List, Ms. Guernsey simultaneously held executive positions and played multiple, overlapping, relevant roles within RPS, JPM, and JPMAM during the time frame at issue: CEO of JPMAM Investment Management Americas during 2003-10, director of RPS from 2006-09, CEO or Chairman of RPS from 2007-09, and President of Respondent JPM from May 2007-2009. *See* EX. 2306.

12. Prior to JPMC obtaining its ownership interest in ACC through EX. 0004, ACC had developed a wholly-owned retirement record keeper service business known as "Retirement Plan Services, Inc.," enabling ACI during the 1990s to bundle marketing of its investment fund products for the retirement marketplace with the types of management services needed by employers (also known as "sponsors") to fulfill needs or

7

requirements for their employee 401(k) retirement plans under ERISA. ACC's and JPM's intent in jointly expanding RPS's retirement business to benefit both of them was an underpinning of their relationship from inception. *See* EX. 0004, Appendix A.

13. Since the 1990s, different types of available investment fund products have existed in the investment product marketplace to meet differing investment goals - some focus on security of principal, some are risk-based, some are age-based and provide laddered investments to provide higher risk in early years and lower risk in later years as the investors near retirement, some invest in international assets, some invest primarily in equities, etc. RPS, as part of its job as retirement plan record keeper for 401(k) plans, reviews funds available for investment in the marketplace and proposes to the employer a suggested line-up from which employees may choose to invest their retirement monies. This culling process is necessary and appropriate because a 401(k) plan may include only a limited number of offerings to employees out of the many funds available in the marketplace. Once a lineup is selected by the employer/sponsor, employees select which of the offered funds best meet their personal goals and apportion their investment assets among the funds offered to them by their employer. Employees cannot invest their 401(k) monies in products off their employer's 401(k) plan. Because the employer's process to change the funds offered to employees is not willy-nilly, being in a lineup for employee asset investment creates the likelihood of significant increased revenue to a fund manager as employees select or move assets among the limited offered products. If only one fund of one type were to be included in the record keeper's proposal, being that fund creates great potential value to the fund's manager, virtually assured of a flow of

8

assets into its fund and resulting increased revenue and future profits for so long as the fund is offered in the employer's plan. The number of reasonably available slots in any one 401(k) plan is limited; the employee audience selecting among the offered funds is captive; and the fund manager has the potential to retain managed assets, notwithstanding ebb and flow of employee contributions and withdrawals, for years and to receive the resulting future profits. Conversely, if a fund on a current plan were promoted against, if a competitor of the fund were assisted by a record keeper such as RPS in efforts to target or market against the fund, or if a fund otherwise were excluded through the actions of a record keeper such as RPS, the fund manager would suffer real ongoing financial loss. If there were no contract between the record keeper and the fund manager requiring or prohibiting certain conduct regarding that fund manager's products, the record keeper may have no liability even if it targeted to remove or replace certain funds or certain managers on existing or proposed plans or even if it provided active and conscious assistance to a competitor's targeted marketing efforts. If, however, a contract such as the Revenue Agreement discussed below exists, that type of conduct by RPS (or by any record keeper party to such a contract) could be and is actionable.

14. From the time ACC created RPS as a separate business, ACI's various managed investment funds were RPS "proprietary" products, meaning they were "house brands" and enjoyed preferential placement opportunity for the limited slots for products of their type offered in fund lineups proposed to plan sponsors by RPS. ACI used RPS and its bundling of plan services with ACI fund offerings as a significant distribution channel to sell ACI investment funds in the retirement investment market.

15. By 1998, the high cost and labor intensity of operating the RPS business caused concern to ACI, and ACI and JPM or a related JPMC entity informally agreed, separate from JPMC's shareholder relationship in ACC, that JPM or an affiliated entity would carry a 50% economic interest in RPS through which JPMC shared with ACI/ACC the financial cost burdens of operating RPS. EX. 1433, EX. 1653. This arrangement created the opportunity for retirement-based investments offered and managed by JPMAM to be considered, like ACI's, as proprietary by RPS and given similar preferential placement in investment lineups proposed to plan sponsors by RPS, side-by-side with ACI's. *See* Appendix A to EX. 0004. JPMAM was not capable of providing, on its own, retirement plan management services like RPS provided, whether bundled with investment product offerings or separately. EX. 0004, Appendix A. Thus, this JPMC/JPMAM/JPM and ACC/ACI arrangement beginning in or around 1998 gave both ACI and JPMAM access to RPS as their significant distribution channel for investment product sales bundled with retirement plan management services needed by employers. Through this arrangement, JPM or its affiliate and ACC/ACI worked together to equally share the operational costs of RPS, and the retirement offerings of JPMAM and ACI both could be proffered by RPS as "proprietary" or "house" products for the limited slots in lineups proposed to employers for their plans. *See* EX. 0004, Appendix A.

16. One area in particular in which both ACI and JPMAM's investment offerings could and did operate side-by-side as RPS "house" offerings was the "stable value fund" area. Stable value funds operate as an option for investors in place of money market accounts, providing security of principal, liquidity, and a small potential upside compared

to money market fund investments. The stable value offering in an employer retirement plan typically serves as the "default" option in the plan; this means that if an employee does not affirmatively designate other managed funds into which his/her retirement assets are to be placed from the various funds offered in his/her employer's plan, the employee's money will be invested in the managed stable value fund.

17. From the beginning of their RPS arrangement, JPMC/JPMAM/JPM and ACC/ACI recognized that stable value funds should not compete against each other for the same investment dollars. Because of the nature of stable value funds, on which there was much credible evidence during the hearing, JPMC/JPMAM/JPM, ACC/ACI, and RPS understood and were in general agreement during the years 1998-2003 that RPS would propose only one stable value fund option in each fund line-up proposed to a plan sponsor. The stable value slot thus was considered by all involved to be a unique asset opportunity. RPS did not propose outside, non-proprietary stable value products to plan sponsors; it only proposed either the JPMAM-managed or ACI-managed stable value product opportunity. In doing this, in accordance with the understanding of JPMC/JPMAM/JPM and ACC/ACI, the two "house brands" for stable value funds jointly had exclusivity vis-à-vis the multitude of other investment managers' stable value fund offerings and, further, they split the single, exclusive stable value slot by sub-market. Specifically, as understood and agreed between them, on one hand JPMAM's stable value offering had the exclusive proprietary stable value slot for large employer plans holding $50,000,000 or more in investment assets and managed those plans' investments as JPMAM "separate accounts" on a plan-by-plan basis; JPMAM received this manager's

11

benefit, revenue stream, and profits. On the other hand, ACI's successful "pooled"
(commingled) stable value fund known as ACSAF exclusively held the stable value
monies invested through various employers' plans that separately held below
$50,000,000 in assets; ACI received this manager's benefit, revenue stream, and profits.
Thus, as against third party stable value products, from around 1998 JPMAM had
historical exclusivity in managing the larger separate account stable value investments for
retirement plans that retained RPS, and ACI had exclusivity in managing the "below
$50,000,000 in assets," smaller plans' stable value retirement investments through its
pooled fund. Both JPM's separate account stable value accounts and ACI's ACSAF were
proprietary to RPS. Both had an exclusive market slot and exclusivity vis-à-vis all
potential third party stable value offerings.

18. Anecdotal evidence of activity exists indicating that on occasion the
$50,000,000 dividing line may have been crossed and a stable value "separate account"
managed by JPMAM was established for a retirement plan that held less than
$50,000,000 in assets prior to June 2003 to meet specific account needs. These are not
notable events in light of JPMC's large ownership position in ACC, the mutual overall
goals of the parties in early years, and the fact that JPMAM had no pooled fund and ACI
had no "separate account" stable value product during that time. Through at least 2003,
according to JPMAM (using its JPMorgan Fleming logo (*see* Tr. 4938:6-16)), the
industry norm for demarcation between pooled and separate account management for
stable value monies in the retirement marketplace was $50,000,000. *See* EX. 306A. The
weight of the credible evidence establishes that the party's understanding prior to and

12

through the time of sale of RPS by ACC to JPM (described below) was that $50,000,000

in plan assets was the intended and agreed demarcation line between RPS's proposal of

the JPMAM separate account stable value product and the ACI commingled account

stable value fund, even if exceptions occurred. In sum, ACI and JPMAM agreed to split

the single stable value slot available for RPS's fund line-ups proposed to plan sponsors

by having ACI's ACSAF serve as the sole proprietary stable value offering on RPS's

proposals for 401(k) plans below $50,000,000 in assets and JPMC's single entity, non-

pooled stable value offering as the sole proprietary stable value offering on RPS's

proposals for plans above $50,000,000 in assets. This shared, demarcated slot was a

valuable asset of each of ACI and JPMAM, protected each of ACI and JPMAM against

potential third party encroachment on the slot, and created a workable and collegial

approach to the shared stable value exclusivity slot vis-à-vis third party stable value

funds. This arrangement benefited and protected both ACI and JPMAM, their revenue

streams, and their profits.

19.   Though ACI had used RPS as its significant and substantial distribution

channel for the sale of various of ACI's collective investment funds since the 1990s, even

after JPMC/JPMAM/JPM and ACC had agreed in or about 1998 to share the cost of

operating the RPS business, the cost of operating RPS was a significant drain on

ACC/ACI. Operating the RPS business simply remained more costly than ACC desired.

In or about 2002 ACC therefore focused on various options to deal with the continuing

financial and operational burden of running RPS.

20. JPMC already had had an interest in purchasing all of the shares of ACC that it did not own or purchasing certain ACI funds or business lines, such as ACI's successful fixed income business based in California, for JPMC's own business. ACC/ACI had not had sufficient interest in agreeing to JPMC's ideas, and so these opportunities had not been availing to JPMC as of 2002. While those JPMC purchase interests continued long after the Revenue Agreement was signed, JPMC never succeeded in obtaining its objective regarding ownership of ACC or purchase of ACC's fixed income business. The difficulty through all the discussions revolved largely around the wide gap between how ACC and how JPMC valued ACC and the ACI products. This wide gap had been and remained a significant issue of disagreement in all negotiations between them for years from well before the Revenue Agreement was signed. JPMC's interest in obtaining control nevertheless continued. Indeed, almost one and one-half years after the Revenue Agreement became effective, JPMAM's Co-Head of Strategy and Development Alexander Cook emailed David Brigstocke (a key JPMAM employee) and others that "Jes' objective is to be able to consolidate ACC with JPMF, and for us to control their distribution, especially their third-party and institutional channels.... We'd like to explore options for gaining control at a minimal price.... We should also structure in a revenue share mechanism ... this should alleviate the issue of our building up the company value and paying more for it down the line due to our own efforts in distributing their products." *See* Ex. 107B. In effect, JPMAM's personnel recognized that the worse ACI's funds would perform over the years of the Revenue Agreement and the lower the asset base managed by ACI would become, the lower ACC's per share value would go;

14

any negotiation effort by JPMC using market value to buy the portion of ACC it did not own or to take over an ACI fund or business line through purchase also would be affected, and the effect would benefit JPMC as a purchaser in the price paid, if it ever succeeded in consolidating ACC into JPMAM.

21. After having been a large minority shareholder of ACC for about four years, and having been unsuccessful in obtaining any agreement to buy the remainder of ACC or certain of its business lines, by 2002 JPMC-related entities were interested in purchasing RPS outright and entered into negotiations to do so. Mr. Staley in particular wanted to buy RPS because of the success of someone he believed had been "ingenious" in building out a successful retirement rollover business "off the back" of a successful 401(k) business at Fidelity Funds. Tr. 2482:4-14. Mr. Staley wanted to use RPS's 401(k) business similarly for JPMAM. Prior to JPM executing the Revenue Agreement, JPMAM, using its JPMorgan Fleming logo, created an analysis saying: "The defined contribution channel, accessed through RPS, has been a significant source of managed assets for ACI –We estimate the present value of the cash flows to ACI from those assets to be approximately $300 million." *See* EX. 27.

22. By 2003, JPMC had purchased Chase Bank and had greatly expanded its retail relationships and its corporate reach, but had not yet purchased Bank One. Bank One owned and managed investment products similar to ACI's funds. JPMC's purchase of Bank One occurred in 2004.

23. Critical to ACC's interest and willingness to consider selling RPS to JPM were retention and protection of ACI's funds' existing preferential, proprietary placement in RPS proposals to plan sponsors for an agreed period of time. Mr. Staley participated in the initial purchase discussions and, as the key component of a purchase agreement, agreed to maintenance of the "status quo" as to how RPS would operate towards and proffer ACI's investment offerings in RPS's lineups to sponsors after a sale. Substantial, consistent, credible evidence from multiple witnesses established that this key condition to the transfer of ownership of RPS to JPM was never modified or diminished, and remained a constant when the Revenue Agreement was executed.

24. As indicated above, Mr. Staley always wore dual hats for JPMC/JPMAM and ACC/ACI and had dual fiduciary duties - as an ACC Board member aware of ACC's and ACI's business needs and as the head of JPMAM charged with increasing the profits of JPMAM and JPMC through transactions favorable to their interests. As noted above, on behalf of JPMC, in the purchase and sale negotiations for RPS Mr. Staley agreed to the requirements and conditions placed by ACC on a sale of RPS to protect ACI's needs and to retain its funds' existing, proprietary "house brand" distribution channel of RPS. The negotiations moved slowly, and Mr. Staley turned the details over to Seth Bernstein, CFO of Investment Management and private banking of JPMAM. When Mr. Bernstein became Global Head of Fixed Income Business for JPMAM in October 2002, David Brigstocke became CFO of JPMAM and concluded the transaction whereby JPM purchased RPS from ACC, including the various agreements that were executed as part

16

of the sale. Mr. Brigstocke remained CFO of JPMAM throughout the remainder of the parties' RPS relationship, as well as at the time of testifying during the Case's evidentiary hearing.

25. The purchase and sale negotiations resulted in the drafting and eventual execution of various agreements whereby JPM became the 100% owner of RPS (*see* EX. 2306) and agreed to certain ongoing multi-year commitments to ACI, including the Revenue Agreement dated as of June 1, 2003 (EX. 0001) between ACI and JPM. ACI also agreed to multi-year obligations to JPM in the Revenue Agreement. The Revenue Agreement is governed by New York law and includes a number of provisions relevant to the issues in dispute in this Case, including Article 2 titled "Revenue Guarantee," Article 3 titled "DC Bundled and IRA Rollover Business," and Article 5 titled "True-Up Payments."

26. In agreeing to protect the status quo of ACI's proprietary position in RPS proposals, Mr. Staley had agreed and the parties understood that ACC/ACI's consideration was to be received over time in the form of future profits to ACI through sale and promotion of ACI-managed funds to plan sponsors under the Revenue Agreement. This agreement benefited JPM substantially: the final agreements between JPM and ACC/ACI included only a *de minimis* cash payment at closing of their agreements of approximately $13,000,000 and provided for a large potential future upside revenue stream to ACI so long as ACI's funds were placed in sponsor plans and JPM lived up to its sales obligations, found in Section 3.01 of the Revenue Agreement.

17

27. Article 2 of the Revenue Agreement provides in part:

2.01 Guarantee. (a) JPM agrees that to the extent that ACIM and its Affiliates do not receive New Revenue in any quarter of any Revenue Year during the term of this Agreement at least equal to the quarterly revenue amount set forth for such Revenue Year on **Schedule 2**, JPM shall pay to ACIM the difference between the New Revenue applicable to such quarter and the quarterly revenue amount shown on **Schedule 2** for such Revenue Year ("**Guaranteed Revenue**", and such payment, a "**Shortfall Payment**") within thirty (30) days after receipt of notice from ACIM claiming a Shortfall Payment is due and owing and the amount of such payment.

(b) .... [I]t is expressly understood and agreed that JPM's maximum aggregate potential liability for Guaranteed Revenue over the term of this Agreement shall not exceed $87,600,000....

2.02 Relationship to Servicing Fees. Any amount payable as a Shortfall Payment hereunder may be offset by any Services Fees due to JPM under **Article 3** hereof.

28. Article 3 of the Revenue Agreement titled "DC Bundled and IRA Rollover

Business" provides in part:

3.01 JPM Obligations. JPM agrees that, during the term of this Agreement, it will cause RPS and JPMI to offer the Investment Products in connection with their respective businesses. In particular, RPS will offer Investment Products combined with record keeping and administrative services and JPMI will offer Investment Products to participants in benefit plans who seek to place all or a portion of their benefits in an IRA. In offering Investment Products, JPM will cause RPS and JPMI (x) to provide the Investment Products substantially the same preferential placement as they provide JPMFAM investment products in relation to third party investment products, (y) to provide substantially the same level of sales and marketing support as each provides to JPMFAM investment products, and (z) to establish a compensation structure for sales associates that is substantially the same for both the Investment Products and JPMFAM investment products. In addition, with regard to plans that were clients of RPS prior to the Closing Date, and to the extent permitted by law, JPM agrees that it will cause RPS personnel to refrain from advising clients to substitute any Investment Product with a product that is not an Investment Product so long as the Investment Product (a) has a Morningstar, Inc. rating of 3,4 or 5 stars, if applicable, or (b) is rated above the 60th percentile for its peer group by Lipper for the prior twelve-month period.

...

18

3.05 <u>Compensation and Expenses</u>. (a) ACIM and its Affiliates acknowledge .... For the first seven years following the Closing Date, in consideration of the performance of the Administrative Services by JPM's Affiliates, JPMI and RPS, ACIM, or its Affiliates, as appropriate, will pay JPM a fee (the "Services Fee"), in an amount equal to the rate set forth in **Schedule 3** times the average aggregate amount of the JPMI Assets during the applicable period.

...

3.08 <u>Term</u>. Except as set forth below, payments under **Sections 3.05 and 3.06** shall continue for a period of seven years from the Closing Date. ... Notwithstanding the first sentence of this **Section 3.08**, if JPM breaches its obligations under **Section 3.01** above, the Services Fee rates shall revert to average market rates.

    29.  Article 5 of the Revenue Agreement titled "True-Up Payments" states in part:

5.01 <u>True-up Payments</u>. ACIM or an Affiliate will pay JPM within 30 days after the first, second and third anniversary of the Closing Date, respectively, an additional fee in an amount necessary, if any, to increase the Services Fee paid under **Section 3.05** above to a blended rate of 40 basis points on all DC Bundled Assets and IRA Rollover Assets (the "**True-up Payment**").

...

5.03 <u>Term.</u> The obligations of ACIM and its Affiliates under this Article 5 shall ... terminate on ... the third anniversary of the Closing Date....

    30.  The second Section 7.02 of the Revenue Agreement states in part in sub-part

(b), the following: "The rights and remedies herein provided shall be cumulative and not

exclusive of any rights or remedies provided by law."

    31.  Article 1 of the Revenue Agreement provides many defined terms used in the

Revenue Agreement, including in Section 1.13 that "Investment Products" means "all

investment options offered by ACIM or its Affiliates." "New Revenue" is defined in

Section 1.21.

32. Mr. Brigstocke, who concluded the contract negotiations with ACC, testified that the $87,600,000 revenue guarantee payment in Section 2.01 was not a limit on potential damages to ACI for breach of Section 3.01 of the Revenue Agreement. Tr. 2731:8-22. His testimony is consistent with the plain language of Section 2 of the Revenue Agreement. Mr. Staley, who had not participated in the negotiation details after Mr. Bernstein joined the negotiations but had agreed to the status quo of the proprietary relationship between ACI and RPS as the key, material component of the deal to purchase RPS, misunderstood the import of Section 2.02 and incorrectly believed it was a cap on JPM's liability if JPM breached Section 3.01. As a result, Mr. Staley was quoted by RPS's executive Thomas Kmak in EX. 136, a 2005 email exchange, as having "shrugged off" a question from RPS employee Melissa Hooker at a July 2005 meeting of RPS's senior leadership team, including Mr. Kmak, by "saying something to the effect: 'RPS has added 800 million in value to the firm. I am not worried about 80 million of guarantees – if I have to pay it, I will pay it.'" EX. 136. Mr. Staley, Ms. Hooker, Mr. Kmak, and Craig Bullis (a recipient of EX. 136) all testified during the hearing. None of them controverted, denied, or disputed that Mr. Staley had made the statement that Mr. Kmak attributed to Mr. Staley in EX. 136.

33. After entering into the Revenue Agreement, JPMC entities and ACI continued their relationships and JPM operated RPS as its wholly-owned business. As stated on the Key Employee List, by June 2003, when the Revenue Agreement became binding on the parties, the head of JPMAM's Investment Management Americas Legal Department Paul Scibetta was installed as Chief Executive Officer of JPM and remained

20

in that position until his promotion in May 2006 to a position at JPMC. Mr. Scibetta was

uniquely qualified to manage JPM and RPS and assure fulfillment of their obligations

under the Revenue Agreement in compliance with that agreement because he had been

involved on JPM's side in drafting the Revenue Agreement when he was in charge of

JPMAM's Legal Department. Mr. Scibetta also served as a director of both JPM and

RPS and an officer of JPM over the relevant years. *See* Ex. 2306. Mr. Staley testified to

his belief that Mr. Scibetta understood the Revenue Agreement.

34. By no later than mid-2003, JPMAM recognized that RPS was the **only**

distribution channel for ACI's ACSAF stable value fund, identified in paragraph 19

above. *See* EX. 302. By July 2003, only one month following the effective date of the

Revenue Agreement, JPMAM, using its JPMorgan Fleming logo, had developed the

multi-page EX. 302, a document dated July 2003 and titled "ACI Stable Value

Acquisition discussion document," marked "Confidential," that states, among other

things:

> **Purpose of meeting**: to kick-off the efforts to acquire the ACI Stable Value
> Pooled Fund ("Stable Value")
> Context: RPS purchase makes Stable Value stranded asset to ACI
>
> ...
>
> Alternative of starting new pooled fund is less attractive
> -Requirement for seed capital and funding for startup costs
> -Current interest rate environment not attractive to start fund
> -ACI pool has critical mass in achieving desired plan diversification
>
> ...
>
> ACI: Stable Value not growing
> -RPS only channel
> -JPMorgan will start competing fund
>
> ...

21

Valuation assumptions – current situation
-JPMorgan not likely to let Stable Value assets grow under ACI control;
JPMorgan would start competing pool, capturing majority of new assets
. . .

-After revenue guarantee period has ended, JPMorgan would actively pursue stable
value business from existing clients away from ACI (run-off of assets in 7 years)

(emphasis in original).

35. Substantial persuasive evidence was introduced into the record establishing

ongoing breaches of Section 3.01 by JPM and RPS regarding the ACSAF that began

quite soon after the Revenue Agreement became effective and after JPMAM created Ex.

302. By September 30, 2003, the date of the email that is EX. 306A, Mr. Scibetta was

included in communication with JPMAM employees such as Messrs. Bernstein and

Brigstocke and Vicky Paradis regarding JPMAM's efforts to impact the ACSAF's

position. Ms. Paradis, who was employed within JPMC at the time of the hearing but did

not testify in person during the hearing, was JPMAM's stable value products portfolio

manager in 2000-09 and thereafter was promoted by JPM. Ms. Paradis wrote in EX.

306A to Mr. Scibetta and others: "We need to either buy the [ACI stable value] fund

from them or decide whether to begin now to create a competing product." Attached to

her email was an analysis titled "Stable Value Issues for RPS 401k business" stating,

among other things:

- Typically SV funds below $50-100 million invest in pools....

. . .

We believe RPS needs a long-term stable value solution.

-We have internally discussed buying the ACI Stable Asset Fund.... Ability to
convince ACI that growth is not feasible will be key to negotiation.

<u>RPS needs a pooled fund solution for several key markets:</u>

...

-We can create a competing pooled fund, but start-up challenges

<u>ACI Stable Asset Fund</u>

-Historically used for SV funds <$40 million. Virtually all clients are RPS bundled plans.

...

**-Revenue share to RPS is currently 40 bps, drops to 10-12 bps after 2005. Creates potential future profitability and competitiveness problem for RPS.**

-JPM could take over RPS fund with little marginal cost, better profitability, competitive product

<u>Negotiating points</u>

-ACI's fund will not grow through RPS....

| Stable Value Fund Size | Historical Solution | Current Process | Future Solution without acquiring ACI Stable Asset | Future Solution with a JPM RPS pool (ACI or JPM) |
|---|---|---|---|---|
| <$20 million | ACI Stable Asset | ACI Stable Asset | Potential new JPM pool | Pool |
| $20-40 million | ACI Stable Asset | JP Morgan separate acct | New pool or JPM separate acct | Pool or JPM separate acct |
| >$40 million | JPMorgan separate acct | JPMorgan separate acct | JPMorgan separate acct | JPMorgan separate acct |

-Plus, when the revenue guarantee arrangement expires *(or sooner)*, we are likely to *cannibalize the pool's current clients.*

...

-However, ACI <u>expects</u> growth from revenue guarantee. *Financial analysis indicates SV assets are not significant to revenue guarantee.*

...

*<u>Key assumptions RPS should confirm</u>*

...

<u>Sales plan:</u>

...

Is ACI Stable Asset financially viable *to RPS* for those target markets?

*Key decisions from RPS for JPMF*

- Go/No go on discussions to acquire ACI Stable Asset Fund

- If no go or not successful, *does RPS need us to start a pool in-house?* Important to decide sooner because of start-up time, need for client critical mass, track record.

EX. 306A (bold in original; italics added). Ms. Paradis encouraged Mr. Scibetta and RPS to focus on profitability and competitiveness for RPS and on JPM's revenue guarantee that might have to be paid to ACI, not on the Section 3.01 obligations to ACI, and RPS's input and advice were solicited for creation and sale of a fund to compete with ACI's ACSAF. Under the Revenue Agreement Section 3.01, RPS could not participate in, advise about, or assist JPMAM's activities to develop, sell, target, or promote its funds against ACI's products or share information regarding ACI's funds to benefit JPMAM's efforts, unless it provided substantially the same level of sales and marketing support and information to ACI about JPMAM's funds for ACI's sales and promotional efforts. The third sentence of section 3.01, subpart (y), prohibited RPS's participation in such one-sided conduct or involvement with JPMAM in this conduct.

36. As an aside, the initial statement in EX. 306A quoted above, that stable value accounts below $50,000,000 in assets typically are placed in pooled funds rather than in separate accounts, supports our finding and conclusion that the understanding between JPMAM and ACI prior to 2003 was premised on the $50,000,000 demarcation line, just as Ms. Paradis's analysis shared with Mr. Scibetta stated was typical in the industry.

24

37. Consistent with Ms. Paradis's communication with Mr Scibetta in EX. 306A, almost from inception of the contract RPS and JPM consistently focused their analysis of the import and effect of the Revenue Agreement on the revenue to be received by them and by JPMC, the revenue guarantee amount JPM potentially would have to pay ACI, and the financial issues and effect for JPM and RPS, not on the meaning and import for JPM and RPS of Section 3.01 vis-à-vis RPS's support and assistance to JPMAM's sales and marketing. For example, in mid-October 2004, Lucinda Gerhard sent Ex. 103C to JPM's Paul Scibetta, an email whose subject line is "ACI Contract Schedule 3," and wrote that she was providing a schedule of reimbursements from ACI "that will be in place after the 40 bps true up goes away in 2006." Her attachment modeled the substantial negative financial impact on RPS upon the expiration of ACI's true-up payment. In October 2004, Ms. Gerhard was the Director of Marketing for JPM Funds and had no employment or other position with or relationship to JPM or RPS according to the Key Employee List and EX. 2306. For JPM and RPS to involve the JPMAM employee in charge of marketing JPMAM funds in analyzing the terms or effects of the Revenue Agreement was wholly contrary to JPM's Section 3.01 obligations. RPS did not consult ACI on the import on RPS's finances of its financial arrangements with JPMAM and JPMAM products or share JPMAM's other proprietary information with employees of ACI who had no position at RPS, like it did with JPMAM's Ms. Gerhard regarding ACI to benefit JPMAM's sales and marketing. By sharing proprietary information of ACI with key employees of its competitor JPMAM (the only competitor for which RPS had contractually agreed to give ACI substantially the same level of sales and marketing

25

support) but not doing likewise for ACI, RPS provided substantially dissimilar levels of sales and marketing support to JPMAM compared to ACI and breached the Revenue Agreement.

38. Less than two weeks after Ms. Gerhard provided her analysis with EX. 103C, an email regarding "an ACI revenue share impact strategy meeting" was sent by RPS employee Melissa Hooker (Head of Sales) to RPS employees Mary Jane Block (CFO), Pamela Popp (Head, Sponsor Services), Jeff Kocen (Vice President of Client Advisors), and Mr. Scibetta, and to JPMAM's Ms. Gerhard saying: "**market strategy** – a side by side comparison of american century (sic) funds, with the '06 schedule of revenue share, and the current competitor *who would best replace american century and their revenue share.*" (bold in original; italics added). *See* EX. 104. Strategizing with JPMAM how to replace ACI's funds in order to protect RPS's and JPM's income, in contravention of the Revenue Agreement's purpose, again breached the Revenue Agreement. Including Ms. Gerhard, an outsider to JPM and RPS but insider to and head of marketing for JPMAM, in developing a market strategy to deal with the expected decline in RPS revenue tied to compliance with the Revenue Agreement's agreed rates, as occurred here, also was a breach of the Revenue Agreement. Nothing in the Revenue Agreement permitted JPM to include JPMAM in a market strategy meeting regarding ACI funds but keep ACI in the dark regarding strategy for sale or replacement of JPMAM funds. To the contrary, such behavior is a breach of the Revenue Agreement.

26

39.  The following month, December 2004, Ms. Block and Mr. Scibetta were planning how to increase RPS revenue by shifting assets from ACSAF to JPMAM, saying, "we could transfer 100% of the current ACI stable asset balance (about $1.6B) to JPM comparable funds with no impact on the guarantee .... [T]he annualized revenue benefit of this shift to RPS is a positive $3.8M (at an 84% shift) or $4.6M (at a 100% shift).  The numbers definitely imply that we should begin positioning existing clients for this move as appropriate."  *See* EX. 109C.  Positioning clients to move away from ACI products to JPMAM products in order to protect JPM and RPS against possible revenue loss is not substantially the same level of sales and marketing support as given to JPMAM and constitutes a breach of the Revenue Agreement.

40.  Mr. Scibetta and Ms. Block maintained their focus regarding the Revenue Agreement on benefits to RPS and JPMAM rather than on the obligations owed to ACI. For example, in mid-2005 Mr. Scibetta thanked Ms. Block for her hard work and continued:

> 4.  ACI Stable Value Product – What should we do?
>
> - JPMF/I wants to replace all ACI with JPM Stable Value.  What should we do if we don't have to worry about the guarantee?  If we do?
>
>                         ...
>
> We ... need input from client/ISG, sales, finance, and JPM stable value team, among others.  And resolution should be a global one that will have to gets (sic) approval from Eve, Bateman, Jes, etc....

See Ex. 121.  The only appropriate position under the Revenue Agreement obligations was that RPS could not assist JPMAM in its plans one-sidedly and had to provide

27

substantially the same level of sales and marketing support to ACI. With knowledge of JPMAM's desire to replace "all ACI" with JPMAM product, JPM/RPS executives considered only the issues relevant to their revenue, wholly disregarded Section 3.01, and did not provide ACI the required Section 3.01 substantially similar level of support.

41. As noted above, between the time JPMC invested in ACC and entered into the informal arrangement to share the benefit and burden of RPS's growth, JPMC had undergone significant change once it purchased Chase Bank and then had access to its retail customers and assets. Another change in JPMC occurred that was significant to RPS when JPMC purchased Bank One in 2004. Bank One had investment funds similar to funds managed by ACI, including specifically a pooled stable value fund referred to at the hearing as SAIF. Because of regulatory permissions and/or approvals required in connection with the takeover of Bank One and its investment products, JPMAM and RPS had months of time to plan positioning and offering of the Bank One pooled stable value fund as JPM's pooled stable value fund, and other Bank One investment products in RPS's proposals to plan sponsors. Former RPS employee Paul Shahrocki, who testified in person during the hearing, wrote in June 2004 that JPMC's takeover of Bank One and the upcoming availability of a pooled stable value fund within the JPMAM family of funds was the "end" for ACI's ACSAF. *See* Ex. 309X.   Based on the evidence at the hearing, RPS's leaders either did not dispel or actively encouraged this attitude and approach by RPS's employees.

42. As indicated by the sampling of evidence discussed above, testimony and other exhibits, admissions against interest made by Mr. Staley and others acting for RPS and JPM prior to the termination of the Revenue Agreement, and reasonable inferences from the evidence, JPM and RPS breached their Section 3.01 obligations. By actively planning the shift from ACI's funds such as the ACSAF to JPM's funds to protect their own revenue (even though they had contractually agreed to specific fees and benefits to RPS and to certain limitations on conduct), JPM and RPS breached the Revenue Agreement. By actively assisting, sharing planning information with, participating with, targeting, and informing JPMAM's efforts to sell and promote its funds against ACI's products, and by the JPM and RPS participation in the chains of analyses, models, emails, and meetings documented by many, many exhibits admitted into evidence in this Case, JPM and RPS breached Section 3.01 of the Revenue Agreement, starting no later than around the time of Mr. Scibetta's receipt of Ex. 306A.

43. Consistent with the belief and admissions reflected in various internal documents among JPM representatives, introduced as exhibits at the hearing, that RPS personnel had significant power to influence and control selection of funds in 401(k) plans by sponsors, we find and conclude that RPS had substantial ability to and did impact, influence, manage, or control sponsor selection of products for inclusion in 401(k) plans. For example, in August 2005, Ms. Block emailed various RPS employees, including Managing Director of Sales David Embry, Vice President of Client Advisors Jeffery Kocen, market strategist Shari Mancher, and Paul Shahrocki, along with JPMAM employee Murali Sankar, and others, to confirm agreement that "Paul Shahrocki and Jeff

29

Kocen will identify the clients with the largest balances for each of the following ACI

funds ... (1) Stable Value, (2) Equity Index, (3) International Growth, (40 Vista, and (5)

Heritage. **They will complete a worksheet that indicates a fund swap strategy for**

**each client with their forecast of the amount to move by year.**" EX. 128 (emphasis

added). Later, the co-head of RPS's Strategic Relationship Managers wrote: "[W]e are

on officially the path to moving clients from ACI to JPM stable value, w/priority on

larger accounts." EX. 151A. These internal statements of RPS's ability to "move"

clients from ACI's products to JPMAM's products, along with other evidence, establish

RPS's influence, power to impact, influence, manage, and control fund selection for

401(k) plans of RPS customers.

44.   In addition to the breaches of subpart (y) exemplified above, the evidence

establishes that JPM and RPS breached subparts (x) and (z) of the third sentence of

Section 3.01 as well as the last sentence of Section 3.01. As to subpart (z) of the third

sentence, the evidence established that over the term of the Revenue Agreement

employees within RPS received bonuses, had sales goals to meet, had their total

compensation impacted through bonus pool amounts available for distribution connected

to the placement of JPMAM products, and had their personal employment positions

informed by an understanding within RPS that sales and promotion of JPMAM products

were more beneficial to their careers than sales and promotion of ACI or other managers'

products. In various ways, they had potential for greater financial benefit individually or

collectively from promoting JPMAM products over other products, including ACI funds.

Confusion existed over time among RPS's sales force as to whether ACI funds even were

30

to be viewed as proprietary, and email exchanges discussed this. Cross-sell goals for promoting and expanding sales of JPMAM products existed. Documents evidencing that ACI funds were not counted in various calculations as proprietary and equivalent to JPMAM funds for sales goals over time were introduced in evidence (one example, EX. 536A). The totality of the evidence supports the finding and conclusion that sub-part (z) was breached. As to sub-part (x), the totality of the evidence and reasonable inferences therefrom establish breach of contract. For example, once JPMAM was aware in 2004 that it would have its own pooled stable value fund available due to the Bank One merger, vis-à-vis third party funds the exclusive placement opportunity to compete with those outside funds was pulled from ACSAF and only JPMAM's fund was given the opportunity to compete against the third party funds for the slot. Thus, vis-à-vis third party funds, RPS did not give ACI's ACSAF "substantially the same" preferential placement as provided to JPMAM's (formerly Bank One's) SAIF stable value fund in relation to third-party investment products; RPS actually gave ACI's ACSAF **no** placement vis-a-vis third party funds once JPMAM had the SAIF available to sell. As to the "last sentence funds," as JPM admits its breach regarding LiveStrong, we find it unnecessary to further address that provision.

45. In short, JPM and RPS stacked the cards against ACI and against compliance with Section 3.01. Almost no one including the top executives of JPM and RPS down the chain of command paid any attention to what the Revenue Agreement said except for the effect it had on RPS's, JPM's, and JPMC's revenue and profits. Mr. Staley misunderstood the Revenue Agreement he negotiated. Because he misunderstood the

31

revenue guarantee provision of the Revenue Agreement as a cap on JPM's liability for its obligations under the Revenue Agreement, Mr. Staley believed that the damages for which JPM could be held liable were miniscule to JPMC, and he led by example - virtually no one on JPM's side of the agreement was charged with or actually concerned about fulfillment of JPM's Section 3.01 obligations. Even Mr. Brigstocke, who had finalized the Revenue Agreement for JPM, testified that he knew that the revenue guarantee provision of the Revenue Agreement was not a limit on possible damages due to ACI for breach of Section 3.01. Nonetheless, he, like the others involved on JPM's side of the deal, received communications establishing that JPM was not complying with or paying attention to Section 3.01 without taking action to correct its conduct.

46. The import and effect of the Revenue Agreement was that RPS remained ACI's proprietary platform for placement of ACI's investment products in 401(k) plans throughout the term of the Revenue Agreement. JPM, however, failed to behave accordingly. For example, Jonathan Thomas, President and CEO of ACI, quoted Mr. Staley in discussion with Mr. Thomas as follows:

But there was actually meetings in '08 where he would say stuff to me like, 'Well, if you want' –

Arbitrator: This is Mr. Staley?

Mr. Thomas: Yeah. I'm sorry. – where Jes would say, 'If you want to have that slot on a recordkeeping platform, then maybe you ought to go buy one.' And I would say, 'Jes, that's the deal we have. You are our sales force. You are our 401 (k) plan. That's the agreement we have.' And he would – and he basically said that –you know, at that point – and I'm not sure if it's second – probably first or second quarter of '08 is where he flat out admitted what they were doing on, you know, the important slots, which are termed the proprietary slots, which would go back to the stable value issue. But it also – we haven't got into it yet – refers to the target-date products on LiveStrong products as well.

Tr. 1425:12-1426:9. Mr. Staley did not dispute, controvert, or deny making these or comparable statements or admissions to Mr. Thomas. The breach underlying JPM's approach is that through the Revenue Agreement ACI had retained its proprietary position at RPS. JPM simply ignored that reality.

## THE PARTIES' DISPUTE AND THE SCOPE OF THIS ARBITRATION

47. Claimant ACI and ACC filed a lawsuit under seal as Case No. 0916-CV13445 in the Circuit Court of Jackson County, Missouri at Kansas City against the JPM Defendants in or about April, 2009 and filed their First Amended Petition ("FAP") (Ex. CX 0005) on or about June 4, 2009. In paragraphs 60 and 61 of the FAP, ACI alleges:

60. Additionally and/or alternatively, Plaintiffs have suffered or will suffer damages of over $300 million, inclusive of:

- At least $ 57.5 million in damages attributable to above-market Services Fees paid to JPM despite JPM's prior material breach of Section 3.01; these damages are due and owing under Section 3.08;

- At least $36.8 million in damages attributable to the 40 basis points reimbursement or "True-Up" payments per Section 3.08 paid to JPM in return for services not performed; these damages are due and owing under Section 3.08

- At least $26 million in damages attributable to lost revenue and investment (including consequential expenses), due to the failure of the Stable Value Fund, specifically sponsored and developed to be placed in the RPS accounts and in JP Morgan channels;

- Over $10 million in damages attributable to swap-outs of ACI Investment Products for JP Morgan investment products, in violation of the Revenue Agreement;

- An approximate $200 million in damages attributable to lost business (management fees) and future damages to ACIM due to the violations of Section 3.01 of the Revenue Agreement, including JPM and its affiliates' refusal to promote ACIM Investment Products (lack of product placement and lack of sales and marketing support) and to compensate sales associates appropriately for the sale of ACI Investment Products; and

- Alternatively and/or in addition, up to $87.6 million due to ACIM's failure to realize the New Revenue amounts described in the Guarantee at Section 2.01 of the Revenue Agreement, and JPM's failure to pay the Shortfall Payments (defined using the market rate for certain payments to JPM), which are due and owing under that Section.

61. The damages described above are ongoing and will increase in the future due ot the continuous nature of the breaches and other wrongful behavior by the JP Morgan entities.

48. The FAP continued in paragraphs 69 and 70:

69. As a direct result of defendant JPM's breach of the Revenue Agreement, plaintiff ACIM has suffered or will suffer damages in excess of $300 million including, but not limited to, lost revenue, wrongfully induced payments intended to compensate JPM for actions ACIM now knows it did not undertake, the failure to receive the full value of the bargained-for and promised participation in accounts at RPS, JPMI and other JPMC distribution channels, the swapping of JP Morgan funds for ACIM funds, the failure of the Stable Value Fund, and alternatively and/or in addition Shortfall Payments and guarantee payments due and owing arising from the failure of ACIM to realize the New Revenue amounts set forth in the Revenue Agreement.

70. Plaintiff ACIM's damages, incurred as a direct result of defendant JPM's breach of the Revenue Agreement, are continuing to be incurred and increasing.

49. In June, 2009, within a short time after the FAP was filed, Mr. Staley and

Erik Ortel, on behalf of the JPM Defendants in Case No. 0916-CV13445, met in Kansas

City, MO with representatives of ACI to discuss resolution of the parties' disputes. Tr.

1541:12-1543:20; 2580:11-23. The JPM Defendants, ACI, and ACC agreed at this June

2009 meeting to settlement of certain disputed issues and to refer other matters to binding

arbitration between and among themselves. According to Claimant's General Counsel

Charles Etherington and Mr. Thomas, both of whom testified in person at the hearing of
the Case, Mr. Staley described with specificity the types of claims the JPM Defendants
would not agree to arbitrate. Mr. Etherington testified that Mr. Staley agreed, among
other things, to terminate the Revenue Agreement as of the settlement and that Mr. Staley
"did not want us pursuing speculative future claims or speculative future theories. And –
and so we – we asked what that meant. And the articulation that he gave us was that he
… didn't want American Century to have any theories they were owed some pro rata
share of RPS's future success." Tr. 1756:21-1760:25. Mr. Staley, who testified in person
at the hearing in this Case after Messrs. Thomas and Etherington testified, testified: "And
if we could get that, you know, litigation down to a narrow debate around - around the
identifiable claims, that seemed to be a fair outcome for us." Tr. 2583:14-25. Mr. Staley
did not recall whether he had a copy of the FAP in hand with him at the settlement
meeting (Tr. 2591:8-11), but he was knowledgeable about the claims pleaded against him
when he met to settle the case. Mr. Staley did not dispute, controvert, or deny the
specific statements that Messrs. Thomas and Etherington attributed to him in their
testimony and did not dispute, controvert, or deny that he used the words "pro rata share
of RPS's future success" as being what he stated the JPM Defendants intended be
excluded from this Case. Mr. Ortel did not testify at the hearing in this Case. Years
earlier, JPMAM, using JPMorgan's Fleming's logo, had calculated a present value of the
future cash flows to ACI from certain assets to be approximately $300 million in EX. 27,
so the JPM Defendants knew long before the settlement meeting that the stream of future
revenue to ACI was quantifiable, and resultingly that the loss of that large future revenue

35

stream to ACI would substantially harm ACI. Mr. Staley's testimony that he believed bullet point 5 of paragraph 60 of the FAP was stricken entirely in the PSA and also that in his reading of the PSA it was in fact entirely stricken (Tr. 2589:23-2591:11) is wholly inconsistent with the PSA itself, which he signed, and wholly unsupported by the credible evidence in this Case. His statement quoted in EX. 136 - indicating his belief that liability for cross-selling JPMAM products and disregarding substantially similar support to ACI products was limited to $80,000,000 - is simply incorrect. The credible evidence establishes that JPM and ACI agreed to exclude the types of damages about which Messrs. Etherington and Thomas testified. Having reached agreement on the broad terms of resolution of certain issues and arbitration of others, the parties turned the matter over to their lawyers (the same ones who represented the parties in this Case) to document their agreement appropriately.

50. The settlement agreement between and among ACC, ACI, and the JPM Defendants was memorialized in the PSA prepared by their counsel and is governed by Missouri law. It was signed and effective July 21, 2009. All signatories to the PSA are bound to all of its terms and provisions. The PSA and the signature blocks for each of the JPM Defendants do not limit the PSA's binding effect on any of the JPM Defendants only to certain provisions or paragraphs of the PSA. All the JPM Defendants therefore are party to the arbitration agreement under which this Case was heard.

51. The parties disputed the meaning and import of certain language in the PSA at the hearing and did not agree on the effect of the PSA's language on the damages that

may be awarded for breach of the Revenue Agreement. In addition to the Revenue

Agreement, the PSA therefore is the second contract that the Panel has been asked to

interpret.

52. The PSA defines the claims to be arbitrated in this Case. Specifically, Article

I of the PSA defined the "Remaining ACC Claims" and "Remaining JPM Claims" that

would be submitted for determination in this Case. "Remaining ACC Claims" is defined

as follows:

"Remaining ACC Claims" means the breach of contract claims alleged through Counts I
and II in the First Amended Petition; provided, however, that ACC may not assert, and
the arbitrators may not adjudicate, any clams seeking recovery of damages as alleged in
the fifth bullet point of paragraph 60 of the First Amended Petition to the extent based on
future damages or lost revenue (including management, service or other fees) attributable
to business ACC never obtained because of a failure to perform the promised
promotional efforts set out in paragraph 3.01 of the Revenue Agreement (the "Excluded
Damages"). Remaining ACC Claims do not include (a) any claim of fraud or breach of
fiduciary duty, (b) any claim sounding in tort, or (c) any claim seeking punitive damages.
ACC may not pursue damages of the type alleged in paragraph 59 of the First Amended
Petition to the extent such damages are Excluded Damages, and the Remaining ACC
Claims shall not contain a claim for Excluded Damages based on the Goldman Sachs
report.

53. Section 3.2 of the PSA provides that the Revenue Agreement was terminated

and, further, JPM paid an agreed amount to ACC and/or ACI representing

the net present value of all guaranteed revenue amounts due or potentially due from J.P.
Morgan Invest Holdings under the Revenue Agreement for periods subsequent to
October 31, 2008, less all Service Fees (as defined in the Revenue Agreement) owed by
ACC that have accrued for the period beginning January 1, 2009 and ended June 30,
2009. Notwithstanding anything contained herein to the contrary, the parties
acknowledge and agree that all other amounts due and owing under the Revenue
Agreement that fall within the definition of Remaining ACC Claims or remaining JPM
Claims shall be adjudicated in the Arbitration.

54. The PSA further includes certain covenants of the parties.   Section 6.1

provides:

Section 6.1.  Covenants of JPM.  JPMorgan Chase covenants and agrees that J.P. Morgan
Invest Holdings will have assets available to satisfy any award that may be rendered in
the Arbitration, and if such assets are not available to satisfy such award, JPMorgan
Chase will make such assets available to satisfy such award, to the extent such assets are
needed.

The reasonable inference from this language is that the parties agreed and understood

that only JPM would stand as the sole Respondent in this Case and that JPMC

covenanted to fund satisfaction of this Award on JPM's behalf if JPM had insufficient

assets available to satisfy the Award.  "JPM" used in the caption of PSA Section 6.1 is as

defined in Section 1.1 of the PSA, meaning JPMC and all its affiliates and subsidiaries,

specifically including each entity that is a party to the PSA, not the more narrowly-

defined acronym "JPM" we use in this Award for Respondent.  Unlike the Revenue

Agreement, the PSA does not have a provision making captions "for convenience only"

and not relevant to construction and interpretation of the PSA.

55. The Protocol (Ex. G to Ex. CX 0005) tracks the PSA's contractual language

regarding this Case by stating as follows:

3.  The claims to be asserted in the Arbitration shall be limited to the following:

(i) ACI may pursue, and the Arbitrators may adjudicate, the claims alleged through
Counts I and II in the First Amended Petition to the same extent as in the dismissed
litigation; provided, however, that ACI may not assert, and the Arbitrators may not
adjudicate, any claim seeking recovery of damages as alleged in the fifth bullet point of
paragraph 60 of the First Amended Petition to the extent based on future damages or lost
revenue (including management, service or other fees) attributable to business ACI never
obtained because of a failure to perform the promised promotional efforts set out in

paragraph 3.01 of the Revenue Agreement (the "Excluded Damages"). Accordingly, in the Arbitration, ACI may not pursue damages of the type alleged in paragraph 59 of the First Amended Petition to the extent such damages are Excluded Damages, and the Demand for Arbitration will not contain a claim for Excluded Damages based on the Goldman Sachs report (identified in Paragraph 59 of the First Amended Petition).

56.  As noted above, "Remaining ACC Claims" includes and establishes jurisdiction before this Panel over all of the FAP Counts I and II including the claims and damages described in paragraphs 69 and 70, except for claims within the carved-out portion of bullet point 5 of paragraph 60 and punitive damages.  The FAP's tort claims were never part of Counts I and II.  Stated in a way that is more substantive for the claims, theories, and remedies that the parties specifically contemplated and agreed were to be presented and enforced in this Case, ACC, ACI, JPM, RPS, JPMAM, JPMC, JPMAC, and Mr. Staley agreed that everything alleged and sought in FAP Counts I and II except a subset of bullet point 5 of paragraph 60 and the pleaded punitive damages were to be and are within this Panel's jurisdiction.

57.  Neither party asserts that the PSA is ambiguous.  Nevertheless, because the parties disagreed early in this Case regarding the meaning and effect of the definition of "Remaining ACC Claims" in their PSA, extensive briefing occurred and argument by the parties was held on Respondent's Motion for Partial Summary Judgment.  The Panel concluded based on the summary judgment submissions and argument that evidence regarding the parties' intent and understanding of the phrase "Excluded Damages" would be submitted during the hearing and issued the Order referenced in paragraph 4 above, providing that such evidence would be given the weight the Panel deemed appropriate in the totality of the evidence.

39

58. Interpretation of a contract is a matter of law. We find and conclude that the meaning and effect of "Remaining ACC Claims" can be and is determined from the contract language and that the testimony presented is consistent with a careful reading of the PSA. The parties incorporated into the PSA the FAP's Counts I and II as the underlying basis for the definition of "Remaining ACC Claims." PSA Section 7.8 stating: "This Agreement **and the other agreements and documents referred to herein** constitute the entire agreement among the parties with respect to the settlement of the Lawsuit..." (emphasis added).   We therefore look, as directed in the PSA, to the FAP Counts I and II and specifically at its paragraph 60 to determine what the parties excluded from this Case.

59. We find and conclude that "Excluded Damages" were not submitted for decision by the Panel, and they are not what is awarded in this Award, as "Excluded Damages" do not include the damages caused by the breaches referenced under bullet points 1-4 of paragraph 60 and the remainder of Counts I and II, such as paragraphs 61, 69, and 70 of the FAP. The language of paragraph 60 itself establishes that this Award is not awarding "Excluded Damages" to ACI. Paragraph 60's introductory phrase establishes that the bullet points below that phrase delineate six **different** categories of **different** harms and **different** alleged recoverable damages to add up to over $300 million in total alleged damages. None of paragraph 60's six bullet points standing alone alleges $300 million in damages. Because bullet point 6 is pleaded as a possible alternative to the other five bullet points, applying English grammar and/or rules of contract construction to the language, one should exclude bullet point 6 from the

calculation in deriving how the bullet points interrelate to allege the $300 million in damages. The only way paragraph 60 of the FAP can be read by the Panel - and the only way it could have been read by the parties to the PSA in using it as their touchstone for the narrowing of claims - is to add together the first five bullet points as expressing five separate, stand-alone claims, with none being subsumed by any other: $57.5 million + $36.8 million + $26 million + $10 million + $200 million = $330.3 million. Each of these bullet points that does not use an internal introductory phrase (as is used in bullet point 6 "alternatively, and/or in addition,") stands on its own. Any parsing of bullet points 1-5 to calculate $300 million in damages without internal phrasing to differentiate the points simply would be arbitrary, capricious, and illogical. If the first four bullet points were subsumed in bullet point 5, with bullet point 6 pleaded as a possible alternative claim, paragraph 60 alleges only $200 million in damages, not the $300 million stated in its introductory phrase. While we address bullet point 6 separately below, we cannot find, and do not find, a basis in the PSA for either party to this Case to contend that bullet point 5 as cited in "Remaining ACC Claims" is anything other than an allegation of a ground for relief separate and apart from the other bullet points of that paragraph. Because the bullet points are separate and distinct, the exclusion of a subset of one bullet point only, without reference to or incorporation of any other bullet point in the exclusionary language, does not alter, exclude, limit, or affect the scope of bullet points 1-4 and recoverable damages thereunder in this Case.

41

60. Furthermore, our finding and conclusion that "Excluded Damages" are not the basis of this Award are supported as well by the allegations of paragraphs 61, 69, and 70 of the FAP, which respectively allege the ongoing nature of the damage to ACI and the $300 million in damages without the specifics of bullet point 5 of paragraph 60. They also are supported by the differences between the language used in the PSA and the FAP as well as the testimony of Messrs. Staley, Etherington, and Thomas.

61. The significance of the interplay between the PSA's defined term "Remaining ACC Claims" and the FAP on which it relies, including paragraphs 60, 61, 69, and 70, is that the claims and damages alleged through paragraph 60's bullet points 1-4 and/or paragraphs 69 and 70 of the FAP are not limited or narrowed by the definition of "Remaining ACC Claims." Instead, the claims asserted in this Case that fall within the scope of paragraph 60's bullet points 1-4 of the FAP by agreement of the parties to the PSA were specifically and without any limitation subjected to the Panel's jurisdiction. The parties' inclusion in the PSA of the specific reference to the FAP and the limitation of only paragraph 60's bullet point 5, without limitation on the total damages that could be asserted as "Remaining ACC Claims," means that each of the bullet points 1-4 necessarily stands separate and distinct from bullet point 5 and that bullet point 5 does not supersede, replace, subsume, or cumulate those other bullet points.

62. Bullet point 6 of paragraph 60 is not excluded from "Remaining ACC Claims" as written in the PSA. Notwithstanding the failure of the definition of "Remaining ACC Claims" to exclude bullet point 6 of paragraph 60 from this Case, Section 3.2 of the PSA

42

quoted above fully resolved bullet point 6, and evidence on that issue was not submitted to the Panel for decision in this Case. All claims relating to the Revenue Agreement Section 2.01's Guarantee Payment were resolved directly in the PSA.

63. The evidence that was introduced at the hearing and the sole factual and legal bases for the damages award herein below are the claims referenced in bullet points 1-4 of paragraph 60 of the FAP, including continuing damages alleged in paragraph 61, and the related portions of paragraphs 69 and 70 of the FAP, including the breach JPM admitted (referenced in paragraph 8 above), to wit:

- Claims and alleged damages relating to above-market Services Fees allegedly paid to JPM despite JPM's prior material breach of Section 3.01

- Claims and alleged damages relating to the "True-Up" payments per Section 3.08 paid to JPM in return for services allegedly not performed

- Claims and alleged damages (including for consequential expenses) due to the failure of the Stable Value Fund

- Claims and alleged damages relating to swap-outs of ACI Investment Products for JP Morgan investment products, allegedly in violation of the Revenue Agreement

64. Another issue disputed by the parties regarding "Remaining ACC Claims" and submitted to the Panel for determination is whether "future" modifies both "damages" and "lost revenue" in the exclusionary language of this defined term. Under normal principles of grammar and customary usage, rules of construction, and the evidence presented, we find and conclude that "future" modifies" both "lost revenue" and "damages" in the PSA and its Protocol. The narrowing of bullet point 5 as drafted by the parties in the PSA means that all revenue lost as a result of breaches during the

43

Revenue Agreement's term remained fully actionable in and subject to the Panel's jurisdiction in this Case. The differences in the verbiage used between the "provided, however" clause in the definition of "Remaining ACC Claims" of the PSA and paragraph 60 bullet point 5 in the FAP are substantive, further support our finding and conclusion that bullet points 1-4 of paragraph 60 are not subsumed in bullet point 5, and support our finding and conclusion that "future" modifies "lost revenue" as well as "damages." Three examples of the differences are: first, bullet point 5 refers to "lost business (management fees) and future damages" while the PSA refers to the more limited "future damages or lost revenue attributable to business ACC never obtained." "Business" and "revenue" are not synonyms in normal English usage, and the parties did not define "lost revenue" in the PSA to be synonymous with "lost business." Had the parties intended to use those words as synonyms, they would have so indicated in the PSA or, more appropriately, just used identical verbiage in the PSA to that found in the FAP so that rules of construction could be applied to them consistently, as replicating each other. Second, the FAP uses the word "and" between "lost business" and "future damages," implying that these are two separate and independent items. The PSA uses "or," which, while not exclusive under the PSA's Section 1.02, does not replicate "and," which easily could have been used by the parties. Third, "damages" and "revenue" are reversed in order in the PSA from the order used in bullet point 5. By using the non-exclusive "or" and switching the order of words from that in the FAP, the parties chose a meaning in the PSA that does not replicate the meaning of the words as used in the FAP. If the parties intended the meanings to be identical in the PSA to those in the FAP, all they had to do

44

was use the same wording or create defined terms. By changing words or word order, or by choosing to use different and undefined words, rules of construction compel the finding and conclusion that the meaning of the phrases in the PSA differs from that in the FAP. We therefore find and conclude that "future" thus modifies both "damages" and "lost revenue."

65.   The full scope of damages caused by JPM's and RPS's conduct during the contract term was quantifiable, just as JPMAM had indicated in Ex. 27 discussed in paragraph 21 above. The present value of the stream of damages effected (that is, caused into effect) by JPM's actions were fully before the Panel for resolution in this Case. In short, we find and conclude based on the evidence that the carve-out provision in the PSA only carved out from the damages claims presented in this Case those damages or lost revenue in the future (that is, after July 21, 2009) under one limited part of one bullet point of the FAP's paragraph 60 but did not limit ACI's range of remedies for any damages and breaches prior to the PSA date, that arose under paragraph 60's bullet points 1-4, or that were pleaded under other paragraphs of Counts I and II of the FAP. Bullet point five thus is effectively irrelevant to this Award because we award only the lost profits that we find and conclude resulted from actions occurring during the Revenue Agreement's term, not the speculative matters of the type Mr. Staley raised at the settlement meeting Mr. Ortel and he attended, as described by Mr. Etherington without dispute from Mr. Staley. Bullet point 5 does not limit or affect the jurisdiction of this Panel to consider fully the claims and damages presented in the hearing of this Case, all

of which fell within the first four bullet points of paragraph 60, and award the damages awarded below.

66. Except for the limitations found in "Remaining ACC Claims," the PSA has no "miscellaneous" provision excluding any legal rights or remedies from the Panel's power to award in this Case. Among other things incorporated in the PSA through Section 7.8 into the recoverable damages in this Case are paragraph 60's verbiage "will suffer damages" and its bullet point 3 reference to "consequential expenses," paragraph 61's "damages ... are ongoing and will increase in the future," and paragraph 70's "damages ... are continuing to be incurred and increasing." Additionally, when they drafted the PSA and its exhibits, the parties were aware of their ability to include a provision regarding remedies and rights generally in agreements, as was done in "Exhibit A" to the PSA, the Option Agreement and its Section 5.12, where they identified permissible remedies available for breach of that agreement.

67. In summary, we find and conclude that the language of the PSA as written establishes intent to permit this Case to fully encompass arbitration of all claims and remedies alleged in Counts I and II of the FAP including paragraph 60's bullet points 1-4 and paragraphs 61, 69, and 70 in their entirety but only a portion of paragraph 60's bullet point 5 and excluding punitive damages. Nowhere in the PSA did the parties state that their agreed, intended narrowing of bullet point 5 was intended to limit or impact the breadth of the claims or remedies available to ACI under the other, independent bullet points of paragraph 60 or elsewhere pleaded in the FAP Counts I and II. We find and

46

conclude that all claims and remedies presented during the hearing fell within the ambit

of FAP Counts I and II paragraph 60 bullet points 1-4 and other Count I and II

paragraphs such as 61, 69, and 70, and were and are subject to the jurisdiction of this

Panel. Thus, for example and not by way of limitation, all claims and alleged damages

suffered that fall within paragraph 60's bullet point 3 relating to the Stable Value Fund,

or within bullet point 4 relating to the swap-outs of ACI's STRATS for JPM's

SmartRetirement rather than LiveStrong or the failure to propose ACI's LiveStrong in

plans proposed to sponsors, properly fell within the Panel's jurisdiction, and any

remedies available under applicable law may be awarded for those breaches.

ACI'S CLAIMS

68. ACI's most substantial claim is that JPM breached each of subparts (x), (y),

and (z) of the third sentence and the last sentence of Section 3.01 of the Revenue

Agreement. We agree. The relevant language states:

In offering Investment Products, JPM will cause RPS and JPMI (x) to provide the
Investment Products substantially the same preferential placement as they provide
JPMFAM investment products in relation to third party investment products, (y) to
provide substantially the same level of sales and marketing support as each provides to
JPMFAM investment products, and (z) to establish a compensation structure for sales
associates that is substantially the same for both the Investment Products and JPMFAM
investment products. In addition, with regard to plans that were clients of RPS prior to
the Closing Date, and to the extent permitted by law, JPM agrees that it will cause RPS
personnel to refrain from advising clients to substitute any Investment Product with a
product that is not an Investment Product so long as the Investment Product (a) has a
Morningstar, Inc. rating of 3,4 or 5 stars, if applicable, or (b) is rated above the 60th
percentile for its peer group by Lipper for the prior twelve-month period.

In addition to the breach conceded by JPM regarding LiveStrong, subparts (x), (y), and

47

(z) were breached far more broadly. Section 3.01 requires complementary conduct by JPM. The broadest of its obligations is found in subpart (y), which requires JPM to provide substantially the same level of sales and marketing support to ACI as is provided to JPMAM products.

69. "Sales and marketing support" is not a defined term in the Revenue Agreement. The only industry expert who testified was Mr. Scott Peterson of Lake Forest, IL, who had been employed until his retirement by a company that was an industry leader regarding employment benefit issues and retirement fund record keeping. Mr. Peterson had never testified previously in any court or arbitration proceedings, and never opined on or even mentioned "sales and marketing support" during his testimony in this Case. Mr. Peterson did not provide any basis to conclude or find that "sales and marketing support" is a term of art with a recognized meaning in the retirement plan record keeping industry. Because he said nothing about the phrase and because it is not defined in the Revenue Agreement, we therefore must interpret the phrase using rules of construction and normal English language. As we previously indicated, under no interpretation of this phrase can RPS's assisting JPMAM to market against, undercut, misrepresent, target, or otherwise favor JPMAM funds over ACI funds be construed as providing ACI products "substantially the same level of sales and marketing support" as was provided to JPMFAM investment products. Simply put, RPS's favoring JPMAM products over ACI's products by providing information to JPMAM employees so they could market against ACI's products but not doing likewise for ACI was a breach of the Revenue Agreement. JPM breached the contract over and over again, beginning as early

48

as Mr. Scibetta's participation with Ms. Paradis, Mr. Bernstein, Mr. Brigstocke, and

others, to impact sales and promotion of ACSAF and to review JPMAM's plans to

cannibalize ACSAF's client base. RPS agents and employees openly assisted JPMAM in

its conduct without regard to the requirements of the Revenue Agreement. RPS and JPM

could have given ACI's funds substantially similar sales and marketing support as given

to JPMAM by sharing with ACI comparable information about JPMAM's funds. The

record is replete with evidence of RPS's active assistance and participation in JPMAM's

actions and JPMAM's use of RPS's knowledge of ACI's products against ACI, without

any concomitant assistance to ACI about JPMAM and its funds. The evidence that

compels this finding and conclusion of the one-sided sales and marketing support given

to JPMAM and its funds is voluminous and includes, but is not limited to:

A. The multitude of emails circulated among RPS personnel, many of whom had dual

roles at JPM/RPS and JPMAM, and JPMAM/JPMC representatives, evidencing

participation with JPMAM's and JPMC's efforts to misuse and manipulate ACI's

business information;

B. The time and effort expended by RPS/JPM and JPMAM employees in modeling,

planning, and evaluating implementation of the strategy to compete against ACI's funds;

C.  The information within RPS's knowledge received from JPMAM of its plans to

market against ACI products and the participation of persons with duties and roles to and

within RPS or JPM (all of whom are charged with knowledge of the Revenue

Agreement's terms) in this conduct; and

49

D. The immediacy of RPS's awareness of JPMAM's conduct to harm ACI's funds after the Revenue Agreement's effective date and lack of action by RPS.

We also find that JPM breached subparts (x) and (z) of the third sentence of Section 3.01 and the last sentence of Section 3.01, and did so without the slightest regard for its contract obligations.

70. Because of the breaches of Section 3.01, the Services Fees also must revert to "average market rates" under the Revenue Agreement. As to this point, JPM again misinterpreted the Revenue Agreement. "Revert" is not a term of art or defined term in the Revenue Agreement, and JPM's expert Mr. Peterson did not testify as to any industry meaning or custom for the reversion provision. We interpret the verbiage through rules of construction and English usage. Among the meanings of "revert" is "turn back" according to at least one version of *Webster's Dictionary*. The only way these Services Fees could "revert" is to turn back to the inception of the Revenue Agreement and re-calculate the Services Fee to determine what they would have been under "average market rates," and then have whichever party owed the other money as a result of the over-payment of these Services Fees refund the overpayment. Here, this means that JPM owes ACI for the overpayment, as described below.

71. JPM contends that it cannot be held accountable in this Case for the conduct of any entity other than itself and RPS. The conduct that breached the contract was direct conduct of RPS employees, agents, officers, agents, and directors, and the actions of these persons is the basis for liability in this Award. That is the conduct on which

50

liability has been found in this Award. Even if that were not true, JPM is incorrect. As noted above, all the JPM Defendants are party to and bound by the PSA and its arbitration provision. Representatives of the JPM Defendants other than JPM appeared and testified at the hearing. Even their counsel and witnesses failed to distinguish specifically among the various JPMC entities in questions and answers at the hearing. Additionally, RPS's current CEO Pamela Popp, who has worked at RPS throughout JPM's ownership of the company, testified about JPMC's management system called "matrix management" whereby persons employed by one entity have supervisory authority for persons employed by other entities; put simply, employees of JPMAM in the sense of an IRS Form W-2 directly supervised the senior staff of RPS, held dual roles within JPMAM and RPS/JPM, had input on RPS employee compensation or bonuses, and participated in directing RPS's business activities. Rather than being merely the shareholder of a company, JPMAC and JPMC structured their relationships with their subsidiary JPM, and JPM structured the management of its wholly-owned entity RPS, as a division of the parent rather than as a separate legal entity. For example, and not as a limitation, even before taking on her multiple official positions for RPS, Ms. Guernsey immersed herself in directing how RPS and the people whose income she impacted should conduct sales and promotion of JPMAM funds against ACI's funds. JPMC and JPMAM representatives either had duties under the Revenue Agreement as a result of their various positions in control of RPS or disclosed their efforts to target and undercut ACI's products to RPS and JPM personnel, who owed duties to ACI through the Revenue Agreement, and RPS assisted in the conduct. Whether those RPS employees and

51

liability has been found in this Award. Even if that were not true, JPM is incorrect. As

noted above, all the JPM Defendants are party to and bound by the PSA and its

arbitration provision. Representatives of the JPM Defendants other than JPM appeared

and testified at the hearing. Even their counsel and witnesses failed to distinguish

specifically among the various JPMC entities in questions and answers at the hearing.

Additionally, RPS's current CEO Pamela Popp, who has worked at RPS throughout

JPM's ownership of the company, testified about JPMC's management system called

"matrix management" whereby persons employed by one entity have supervisory

authority for persons employed by other entities; put simply, employees of JPMAM in

the sense of an IRS Form W-2 directly supervised the senior staff of RPS, held dual roles

within JPMAM and RPS/JPM, had input on RPS employee compensation or bonuses,

and participated in directing RPS's business activities. Rather than being merely the

shareholder of a company, JPMAC and JPMC structured their relationships with their

subsidiary JPM, and JPM structured the management of its wholly-owned entity RPS, as

a division of the parent rather than as a separate legal entity. For example, and not as a

limitation, even before taking on her multiple official positions for RPS, Ms. Guernsey

immersed herself in directing how RPS and the people whose income she impacted

should conduct sales and promotion of JPMAM funds against ACI's funds. JPMC and

JPMAM representatives either had duties under the Revenue Agreement as a result of

their various positions in control of RPS or disclosed their efforts to target and undercut

ACI's products to RPS and JPM personnel, who owed duties to ACI through the Revenue

Agreement, and RPS assisted in the conduct. Whether those RPS employees and

representatives willingly participated in JPMAM's conduct or merely acceded to what its parent wanted to do is irrelevant – either one is a breach of contract for which JPM is liable.

72. Nothing in the Revenue Agreement absolved JPM of liability for or protected JPM or RPS against actions of their executives, directors, officers, employees, or agents because those persons also had other roles within JPMC. JPM chose to permit and place those people in roles for RPS and JPM while they served in roles for a competitor of ACI. JPM's legalistic argument that it could not be held responsible for the actions of JPMAM or other JPMC entities is unavailing. For example, as soon as JPM and RPS were aware of JPMAM's efforts to market against and damage ACI's products to benefit JPMAM's products and profits, in fall 2003, JPM and RPS could not assist or participate in those JPMAM efforts without equally favoring and assisting ACI. JPM's and RPS's breach was ongoing throughout the remainder of the term of the Revenue Agreement as RPS's and JPM's agents, officers, employees, and representatives - including but not limited to Paul Scibetta, Thomas Kmak, Eve Guernsey, Mary Jane Block, Lucinda Gerhard, Melissa Hooker, Diane Minardi-Stone, and others - gave assistance and support to JPMAM's efforts to sell its products against ACI's products. They shared with JPMAM representatives such as Vicky Paradis information gained through RPS's relationship with ACI; they commented upon models, plans, and proposals generated by JPMAM relating to ACI's products without regard to the Revenue Agreement's limitations on that conduct. The email strings evidencing the breaches of the Revenue Agreement were and are voluminous and consistent, and can lead to no other rational finding or conclusion.

Moreover, Ms. Guernsey's dual roles on behalf of JPMAM's funds and as an officer or director of JPM or RPS meant she - like the other JPM and RPS employees, agents, and officers - should have recognized that the Revenue Agreement placed limitations on RPS's and JPM's efforts to tap ACI's customer base for cross-sells to competing JPMAM products. As noted above, we find and conclude that the conduct of JPM and RPS standing alone constituted breaches of contract by JPM and RPS and that the damages referenced below flowed directly from their direct conduct. Viewing JPMAM/JPMC as separate legal entities from JPM and RPS, JPM and RPS personnel - starting with Mr. Scibetta and continuing down the chain of authority and through time - provided information about the ACI funds and communications with ACI employees to their competitor JPMAM without telling ACI that it was doing so, and without giving ACI comparable information about the JPMAM funds and plans. While we could more specifically address the breaches of the other portions of Section 3.01 further, we find it unnecessary to detail our analysis of liability further.

## ACI'S DAMAGES

We now turn to damages. Before addressing the expert testimony presented, we address contentions regarding the type and nature of damages that can be awarded for JPM's breaches under the Revenue Agreement and the PSA.

73. While a conclusion of "total breach" would support an award of restitution, we do not award restitution to ACI. JPM's and RPS's performance under the Revenue Agreement violated Section 3.01 for the benefit of JPMC contrary to the agreements

53

made by Mr. Staley and others in the Revenue Agreement. We find and conclude that JPM's conduct constitutes an "efficient breach" of the Revenue Agreement, wherein JPM believed it more financially beneficial to JPM and JPMC to breach the Revenue Agreement than to comply with the obligations it had assumed in that agreement, and we therefore award damages under New York law to ACI rather than restitution.

74. We are not awarding any damages based on a "valuation" of RPS and therefore need not address JPM's contention that its economic interest in RPS and previous payments to ACI must be accounted for in the Award. To the extent, however, any party would contend that some "relief," "discount," or other reduction of the total damages suffered by ACI should be made due to JPMAC's ownership of more than 40% of ACC (because, through the possible increased value of JPMAC's shares resulting from this Award, a large percentage of the Award value will be "returned" to JPM's affiliate JPMAC and through it ultimately to their shared parent JPMC),we find and conclude that all evidence of conduct is to the contrary of any such effort to reduce the Award damages. Two examples of why this argument is inappropriate will suffice: First, rather than discounting the Services Fee to be paid to JPM under Section 3.08 based on its affiliate's ownership in ACC, JPMC negotiated for above market Services Fees from ACI notwithstanding the effect of those above market fees on the shares in ACC owned by its affiliate JPMAC. Second, after having breached the Revenue Agreement for years, in seeking to require ACI to pay increased revenue share to RPS in order to improve the possibility of RPS promoting ACI funds (even though the Revenue Agreement already required this), JPM and RPS did not discount any part of what they sought from ACI

based on JPMAC's shareholder status in ACC. In negotiations both before and after the Revenue Agreement was signed, JPM expected market rates be paid to RPS by ACI without any discount based on or consideration of JPMAC's ACC shareholder status. That over 40% of the monies JPM sought from ACI effectively came out of the pocket of a sibling entity was not considered material by the JPM and JPMAM representatives in any of their many documents in evidence discussing ways to increase RPS's revenue from ACI. Additionally, JPM claimed throughout the hearing that the actions of other JPMC entities and their employees cannot be attributed to JPM; likewise the benefit conferred through this Award on JPMAC should not be decreased due to its status as an affiliate of JPM. We find no legal or factual justification in the record to support any notion that damages to ACI should be reduced because a JPM affiliate will benefit from the Award through its shareholder status in ACC.

75. We now turn to whether the "lost future profits" portion of damages sought by ACI and evidenced through the experts are "general damages" or "consequential damages" under New York law and, if "consequential damages," whether the evidence supports a finding and conclusion that they were specifically contemplated by the parties in order for us to award them. For the purposes of this discussion, we look primarily to the case law cited by JPM as the party contending these damages may not properly be awarded to ACI under New York law. This does not mean that we find and conclude that New York law is as strident on this issue as JPM contends; to the contrary, we simply find and conclude that even under JPM's contentions about the applicable law, ACI established its right to recover lost future profits under New York law as it is pronounced

by JPM.    The applicable law is relatively straightforward: "As a general matter, 'lost profits' constitute 'general damages' when 'the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract.' (citation omitted.) Such damages are 'the direct and probable consequence of the breach,' and amount to 'precisely what the non-breaching party bargained for.' (citation omitted.) Lost profits are properly considered consequential damages, by contrast, 'when, as a result of the breach, the non-breaching party suffers loss or profits on collateral business relationships.'" *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp.2d 314, 322 (S.D.N.Y. 2009). "[L]oss of future profits which would have been earned but for the breach of contract are recoverable, provided they satisfy three criteria. 'First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty.' (citation omitted.) Third, 'there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.' (citation omitted.)" *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp.2d 419, 430 (S.D.N.Y. 2004). *See also, Tractabel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 107 (2d Cir. 2007); *Kenford Co. v. County of Erie*, 537 N.E.2d.176 (N.Y. 1989); *Kenford Co. v. County of Erie*, 493 N.E.2d 234 (N.Y. 1986).

76.    Accepting for the sake of our analysis that these cases state the general legal principles applicable under New York law, we find that the damages we award below, including the lost profits amounts awarded below, are the type of lost profits that fall within "general damages" under New York law applied to the contracts here at issue and

are the direct and probable consequence of JPM's breach. We find and conclude that ACI's lost future profits awarded below were proven by a preponderance of the evidence with certainty to have been caused by JPM's and RPS's breaches of contract; they were not remote and they were not the result of other intervening causes. They were fairly within the contemplation of the parties at the time the Revenue Agreement was made and again at the time the PSA was made. Whether the lost future profits are "general" or "consequential damages" under New York law, ACI carried its burden of proof and is entitled to them. We recognize that we are interpreting the Revenue Agreement that, with regard to the damages that may be recovered thereunder, was later clarified by the more specific language on this issue found in the PSA, and examine both for our determination.

77. Turning first to the Revenue Agreement, the sale of RPS to JPM was not structured as a "plain vanilla" purchase agreement. The undisputed evidence establishes that the parties agreed in 2003 that JPM's consideration was to be received by ACI over time through placement of ACI investment products; the parties recognized, at the time of contracting, that RPS was nearing but not yet profitable operationally and that multi-millions of dollars had been invested in RPS's business. They contemplated and agreed that JPM transferred very little money at closing for the entire ownership of RPS and contemporaneously delivered the executed Revenue Agreement under which it was obligated to create the future profits to ACI, knowing full well, as was consistently presented in evidence, that the consideration was to be received through the future flow of assets into ACI funds through RPS's sales efforts and the future profits ACI would

obtain. The contractual obligation to create future growth in assets under management at ACI and resulting future profits to ACI stood in the stead of larger, immediate, and specific payment from JPM in exchange for the benefit JPM received in becoming owner of RPS.

78. In addition, the parties agreed that ACI would help JPM fund RPS's operations by paying Services Fees at well above market rates for the first few years of JPM's ownership of RPS and by making the True-Up Payments. The above market Services Fee and True-Up Payment provisions in the Revenue Agreement evidence that the parties understood that the financial arrangements between them only made sense and were agreeable because of the multi-year nature of obligations in combination: the benefits conferred on JPM from ACI as part of JPM's purchase of RPS were to be received over time, and the benefits conferred on ACI likewise were to be received over time, specifically through JPM's compliance with Section 3.01.

79. The entire structure of the Revenue Agreement, the documentary evidence, and the testimony elicited through witnesses on direct and cross examination establish that future profits are precisely what ACI bargained to receive and JPM bargained to provide in the Revenue Agreement. The certainty of damage from JPM's breaches was established by the evidence, the vast majority of which is not cited in this Award. It would be wholly inconsistent with the intent of the parties, the purpose of the Revenue Agreement, and other evidence introduced at the hearing for us to find or conclude anything other than that JPM agreed in entering into the Revenue Agreement to create

58

future profits for ACI, albeit that they would be paid via increased assets under management and related future profits to ACI rather than directly from JPM's own pocket. ACI's loss of those future profits is the direct and probable consequence of JPM's breach of the Revenue Agreement. We find and conclude that the lost future profits are general damages proven with the requisite certainty under New York law and are recoverable to ACI, and we so award them.

80. To the extent JPM alleges that any portion of the damages awarded herein below are "consequential damages" rather than "general damages" under New York law, and therefore that the requirements of *Tractabel, Great Earth,* and the *Kenford* cases apply, we also find and conclude that ACI met its burden and is entitled to recover those lost future profits applying the test of those cases. We address the three elements of *Tractabel, Great Earth,* and the *Kenford* cases in reverse order because the third element of the analysis - a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made - is key. First, as discussed above, the parties specifically crafted their agreements in 2003 to provide that compensation in the form of future profits to ACI was the method for transfer of consideration from JPM at the sale of RPS. Consistent with that underlying premise, the Revenue Agreement specifically provided that the rights and remedies therein provided were cumulative and not exclusive of any rights or remedies provided by law. The parties did not seek to exclude within that agreement any possible remedy for breach of the Revenue Agreement. That agreement establishes that that the parties contemplated future profits to ACI as consideration it was intended to receive. Then, when the PSA

59

was signed in 2009 and the parties negotiated to consciously limit remedies available for the breaches each claimed already had occurred, the parties knew exactly what was pleaded in the FAP. They specifically cited and incorporated the FAP into the PSA, and they specifically excluded in the PSA certain categories of damages alleged under Counts I and II of the FAP and did not exclude other categories of damages sought in the FAP. For example, Paragraph 60's bullet point 3 specifically cites "lost revenue and investment (including consequential expenses)...." Paragraph 61 of the FAP specifically references that the damages alleged in paragraph 60 "are ongoing and will increase in the future." Count I's paragraph 70 alleges that the damages "are continuing to be incurred and increasing" and its prayer for relief seeks "in excess of $300,000,000.00" plus "punitive damages...," among other relief requested. Count II's paragraph 75 alleges specifically that "plaintiff has or will be damaged in excess of $300,000,00.00" and Count II's prayer for relief likewise seeks recovery in excess of $300,000,00 plus punitive damages, among other relief. In the face of the clear evidence that the parties had the FAP in their possession and the words "lost revenue," "consequential expenses," "ongoing," "increase in the future," "continuing to be incurred," "increasing," and "punitive damages" throughout Counts I and II before them, but excluded in the PSA only the request for "punitive damages" and a subpart of bullet point 5 from Counts I and II, the only reasonable inference, finding, and conclusion that can be made is that future lost profits necessarily were within the contemplation of JPM and ACI at the time Mr. Staley negotiated the settlement, at the time the PSA's language was drafted by counsel, and at the time the PSA was signed. We find and conclude that the parties' specificity in

narrowing the broadly worded FAP only in certain respects, the remedy specification in the provision of the Option Agreement attached to the PSA previously discussed, and other evidence establish that the JPM Defendants and ACC/ACI contemplated in drafting their PSA that an award can and may be entered in this Case for lost future profits as consequential damages, if those lost future profits are not "general damages" under New York law in this Case.

81. Because that third element under *Tractabel, Great Earth*, and the *Kenford* cases so clearly supports an award of lost future profits in this Case, we turn briefly to the first two elements of their test, certainty that such damages have been caused by the breach and that the alleged loss must be capable of proof with reasonable certainty. As previously noted, future profits **were** the consideration to be received by ACI under the Revenue Agreement. The loss of these was proven with certainty as caused by JPM's and RPS's breaches. Our analysis as to why these damages in fact are "general damages" under New York law equally establishes this element of certainty of causation if these damages were to be analyzed under the "consequential damages" standard. As to the remaining element if these lost future profits were to be considered "consequential damages," we find and conclude that the loss of the future profits was capable of proof with reasonable certainty. The damages experts' testimony provides us the requisite level of reasonable certainty. Indeed, we find that the expert testimony on which we rely below established the lost future profits as damages as required by New York law whether those lost future profits are considered "general damages" or "consequential damages." In addition, the independent evidence of the disparity between redemptions of

61

ACI funds held through RPS compared to redemption rates for funds held outside RPS

establishes, separately from the expert testimony, certainty of the loss as caused directly

by RPS's and JPM's conduct under the standards of New York law for lost future profits

under both a "general damages" and a "consequential damages" analysis.

82. ACI relied on one expert who testified in person to establish its damages, Dr.

William N. Goetzmann, the Edward J. Beinecke Professor of Finance and Management

Studies and the Director of the Intenational Center for Finance at the Yale School of

Management. Dr. Goetzmann issued his expert report dated November 10, 2010 (EX.

1423) and his rebuttal report dated January 17, 2011 (EX. 1425). In addition to JPM

expert Scott Peterson mentioned above, JPM's second expert was Dr. Michael F. Koehn,

an economist specializing in micro economics and finance who co-founded a consulting

firm named Analysis Group, Inc. Dr. Koehn's expert report was dated December 17,

2010 (EX. 2189). Dr. Koehn's report and testimony were more directly relevant to the

Panel's consideration of damages suffered by ACI resulting from JPM's breaches of

contract than Mr. Peterson's, but were hampered by the failure of his report to actually

address damages to controvert Dr. Goetzmann's analysis. Setting aside theoretical

differences between the reports and testimony of Dr. Goetzmann and Dr. Koehn, Dr.

Koehn's report commented on Dr. Goetzmann's EX. 1423 without providing his own

calculation of damages suffered by ACI based on Dr. Koehn's interpretation of alleged

analytical errors by Dr. Goetzmann. In his rebuttal report, Dr. Goetzmann responded to

the items on which Dr. Koehn commented and made what he apparently believed to be,

and testified to be, adjustment where necessary. Apparently recognizing this and other

gaps in his analyses and report, in testifying Dr. Koehn presented some additional analysis and modeling not included in his report relating to damages suffered by ACI. While interesting, his later damages modeling merely convinced the Panel that ACI's lost future profits were proven with requisite certainty, that the scope of ACI's lost future profits was capable of proof with reasonable certainty, and that Dr. Koehn's report was not as thorough or helpful to the Panel as was Dr. Goetzmann's, which was more exhaustive and actually provided analysis of economic harm, including damages amounts. Additionally, in presenting his testimony and opinions, Dr. Koehn was visibly and openly uncomfortable with his own testimony and opinions. As a result of the quality of the analysis in the expert reports submitted, the testimony presented, and the demeanor of the expert witnesses in testifying, we find Dr. Goetzmann's reports and testimony to be more credible and more representative of the harms suffered by ACI resulting from JPM's breaches of contract, and we accept Dr. Goetzmann's analyses except to the extent limited below. Having heard the testimony and studied the experts' reports, we find and conclude that Dr. Goetzmann's analysis provides us the requisite level of proof to fulfill the requirements of New York law under the standards for both "general damages" and "consequential damages."

83. ACI carried its burden of proof of JPM's breaches of contract regarding ACI's Stable Value Fund, originally asserted in bullet point 3 of FAP paragraph 60, by far more than a preponderance of the evidence. The evidence of breach of duties in the conduct of JPM and RPS representatives was actually overwhelming. The evidence established that in or about 2007 JPMAM took over, without any financial consideration

to ACI, the very ACI stable value fund Mr. Scibetta had been told by email years earlier, in Ex. 306A, JPMAM was interested in controlling. We find and conclude that JPM knew that RPS was the only sales force for ACI's ACSAF since as early as EX. 302, the "failure" of the ACSAF was the foreseeable result of JPM's and RPS's breaches of the Section 3.01 obligations, and causation exists to impose damages. We agree with and accept Dr. Goetzmann's analysis and finding of damages to ACI from JPM's breaches regarding the ACI's ACSAF Stable Value Fund of $128,297,688.00 in damages as of March 31, 2011, comprised of $25,247,688.00 in past lost profits and pre-award interest through March 31, 2011, plus $103,050,000.00 in present value of lost future profits to ACI as of March 31, 2011 due to the damage that it suffered on its stable value fund during the Revenue Agreement's term, as set forth in Dr. Goetzmanns' rebuttal report Appendix B, Figures 2-25 and 2-27.

84. Turning to the ACI asset allocation funds (the STRATs investment assets that were shifted into JPMAM's SmartRetirement funds and JPM's admitted breach in failing to propose ACI's LiveStrong funds as an asset allocation option), these damages fall under bullet point 4 of the FAP's paragraph 60. We recognize that plan sponsors were shifting from risk-based funds to age-based funds as favored investment options during the time frame of the early 2000s. The significance of this in JPM's view is that sponsors allegedly would move in the marketplace away from the STRATs without any wrongful conduct by JPM. The misstep in JPM's contention is that ACI's LiveStrong age-based funds were exactly the type of fund to which the market was shifting, the Revenue Agreement in Section 3.01 specifically permitted shifts within and among ACI products

as appropriate without liability to JPM, the ACI age-based funds had longer and better performance history than did the JPMAM ones, and JPM has admitted that a breach occurred as to these (even if it downplayed the scope and significance of the breach). We find and conclude that causation and foreseeability from JPM's and RPS's breaches of contract as to these were established. The issue to determine is simply the amount of damages suffered by ACI due to this wrongful conduct. In determining damages we find that Dr. Goetzmann's calculation of past damage including pre--judgment interest in the amount of $47,094,127.00 is reasonable and supported by the evidence. We reach a different conclusion with respect to Dr. Goetzmann's calculation as to future damages relating to the asset allocation funds. Dr. Goetzmann measured future damages under two scenarios. Based on the evidence relating to the market in question, customer preferences, and other evidence relating to causation as to future damages presented at the hearing, we find that both Scenarios 1 and 2 devised by Dr. Goetzmann are speculative as to each swap category identified by Dr. Goetzmann. We do find, however, that Dr. Goetzmann's calculations as to the actual lost future profits (without Dr. Goetzmann's Scenario 2 weighting) for swaps to JPMAM of STRATs and Balanced Funds and swaps to JPMAM of LiveStrong in the respective amounts of $16,587,050 and $4,228,268 are reasonable and proven with the requisite certainty, and we award those amounts.

85. The third category of damages sought by ACI and analyzed by Dr. Goetzmann are the so-called "Last Sentence Funds," which relate to the last sentence of Section 3.01. The evidence at the hearing was essentially unrefuted that JPM breached

the last sentence of Section 3.01 by swapping out certain funds that the language of the last sentence of Section 3.01 prohibited them from doing. Having concluded that JPM is liable for breach of this sentence, it is necessary to determine the damage caused by this breach. Notwithstanding JPM's breach of this sentence, we find that the evidence with respect to the ACI Equity Index Fund and the International Growth Fund, Investor Class, is too speculative to award damages. In addition, Dr. Goetzmann determined damages for STRATs and Balanced Funds under his last sentence calculations. We do not award any damages for these funds under this category of breach because we previously have awarded damages under the asset allocation analysis detailed in paragraph 84 above. We do find that ACI is entitled to damages for breach of the last sentence of Section 3.01 for JPM's swapping out of ACI's Prime Money Market and Premium Money Market Funds as calculated by Dr. Goetzmann in the total amount of $3,859,397, which includes past and future profits and pre-award interest through March 31, 2011.

86. Turning to the Section 3.08 damages, we find and conclude that causation and foreseeability from JPM's and RPS's breaches of contract as to these were established. As to the Services Fee reversion, Section 3.08 mandates this reversion if a breach of Section 3.01 of the Revenue Agreement occurred. This mandate cannot be interpreted, as JPM contended, as an exclusive remedy for JPM's breach of Section 3.01. Section 3.08 states "Notwithstanding the first sentence of this **Section 3.08**, if JPM breaches its obligations under **Section 3.01** above, the Services Fee rates shall revert to average market rates." Nothing in that sentence indicates that the Services Fee reversion to market rates was agreed to be an exclusive remedy for breach of Section 3.01, or even

66

can be considered as any remedy for breach of Section 3.01. Section 7.02 of the Revenue Agreement states: "The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law." We find and conclude that Section 3.08's reversion provision simply further supports the significance and critical nature to the parties of compliance with Section 3.01, and memorializes the parties' agreement that if a breach of Section 3.01 occurred, the agreed above market Services Fee paid by ACI to JPM during the first years of the Revenue Agreement should be adjusted so that the parties' fee relationship was like any other fee relationship of JPM, at market rather than a "sweetheart deal" for a party that breached its obligations under the Revenue Agreement. Both Dr. Koehn and Dr. Goetzmann testified to calculations of the amount due to ACI once the Services Fee reverted to market rate. While they disagreed on the specific amount, even Dr. Koehn testified it would be no less than $128,000,000 as of the hearing. In light of the overall credibility of the experts, we find and conclude that ACI's damages under Section 3.08 is $161,180,000 as of March 31, 2011, comprised of $73,290,000 in principal and $32,260,000 in interest on the Services Fee overpayment plus $36,770,000 in principal and $18,850,000 in interest through March 31, 2011 on the overpayment of the True-Up fees. We therefore award ACI these amounts in damages representing the Services Fee, including True-Up, overpayments to JPM/RPS, reverted back to market rate for the period in which these payments were made.

JPM'S COUNTERCLAIM

87.  JPM failed to carry its burden of proof on its Counterclaim.  Additionally, the Counterclaim lacked merit under the evidence that was presented.  The Counterclaim is denied.

TOTAL DAMAGES AWARDED AND INTEREST

88.  The interest rate applicable to the damages awarded is 9% per annum under New York law.  In addition to the amount of interest described above based on the expert testimony, interest has continued to accrue since the effective date of Dr. Goetzmann's report at 9% per annum (using 365 days in a year) on the principal sums awarded herein above.  As of the August 15, 2011 date of this Award, an additional 137 days of pre-Award interest has accrued at 9% per annum on the sums awarded above.  This Award is therefore in the following total amount:

A)  $128,297,688.00  in damages through March 31, 2011, plus pre-Award interest on $128,297,688.00 from April 1, 2011 through August 15, 2011 at $31,635.04 per day, totaling $4,334,000.80 in pre-Award interest from April 1, 2011 through August 15, 2011, for total damages on the Stable Value breach of contract of $132,631,688.80;

Plus

B)  $67,909,445.00 in damages through March 31, 2011, plus pre-Award interest on $67,909,445.00 from April 1, 2011 through August 15, 2011 at $16,744.79 per day,

totaling $2,294,036.20 in pre-Award interest from April 1, 2011 through August 15, 2011, for total damages on the STRATs breach of contract of $70,203,481.20;

Plus

C) $3,859,397.00 in damages through March 31, 2011, plus pre-Award interest on $3,859,397.00 from April 1, 2011 through August 15, 2011 at $951.63 per day, totaling $130,373.31 in pre-Award interest from April 1, 2011 through August 15, 2011, for total damages on the Prime and Premium Money Market funds breach of contract of $3,989,770.30;

Plus

D) $161,000,000.00 representing the overpayment of Services Fees reverted to average market rates, plus pre-Award interest on $161,000,000.00 from April 1, 2011 through August 15, 2011 at $39,698.63 per day, totaling $5,438,712.30 in pre-Award interest from April 1, 2011 through August 15, 2011, for total damages on the Services Fee reversion of $166,438,712.30.

Thus, the total amount awarded to Claimant by this Award is $373,263,652.60.

89. Post-Award interest shall accrue on the total of all sums due and owing in this Award, $373,263,652.60, at the New York statutory rate of 9% per annum until satisfied in full.

69

90.  The Protocol provides in paragraph 8 that the fees and expenses of the American Arbitration Association and the Arbitrators "shall be divided evenly between the Parties."  We do not award those fees and expenses or any costs to the prevailing party ACI, in accordance with the Protocol.  The administrative filing and case service fees of the American Arbitration Association totaling $92,202.13 and the fees and expenses of the arbitrators totaling $431,363.64, shall be borne equally by the Parties. Therefore, JPM shall reimburse ACI the sum of $27,398.92, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by ACI.

91.  The Commercial Arbitration Rules of the American Arbitration Association provide in Rule R-1(a) that "parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules...." Rule R-1(c) provides that, when a claim is of the appropriate dollar value for the Large, Complex Commercial Dispute Procedures to be applied, the "Procedures for Large, Complex Commercial Disputes shall be applied as described in Sections L-1 through L-4 of these rules, in addition to any other portion of these rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes." ACI and JPM agreed in their Protocol's paragraph 1 that the Case's arbitration "shall be conducted in Kansas City, Missouri, pursuant to the Commercial Arbitration Rules and Mediation Procedures (Including Procedures for Large, Complex Commercial Disputes) of the American Arbitration Association ("AAA Rules"), except as modified by the Parties in this Protocol

70

and otherwise (including modifications for self-administration)." Consistent with the AAA Rules designated by ACI and JPM for a case of the dollar value here, the parties agreed to have a three person panel for this Case. After the hearings in this Case commenced, a vacancy occurred in the Panel. The Protocol does not modify the AAA Rules' Rule R-19 regarding vacancy on the Panel; ACI and JPM did not otherwise modify, or even address, the agreed AAA Rules regarding vacancy on the Panel; and AAA Commercial Rule R-19 regarding vacancy on a panel does not conflict with the Procedures for Large, Complex Commercial Disputes. AAA Commercial Rule R-19 therefore governs vacancy on this Panel. Rule R-19(b) provides that a case may proceed to award issued by less than the full panel (indeed, with as few as only one panel member remaining) if vacancy occurs after the hearings have commenced, unless the parties have otherwise agreed, and has no restriction or limit to that Rule's applicability through award issuance and cessation of the Panel's jurisdiction. Rule R-19(b) states "after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise." In accordance with and as authorized by AAA Commercial Rule R-19(b) and the Protocol, the two members of this Case's Panel remaining after the vacancy on this Panel have continued with and determined this controversy, and hereby have issued this Award.

92. This Award is issued in full satisfaction of all claims presented in this Case. All relief not herein above granted is hereby denied.

71

93. This Award may be executed in multiple counterparts, all of which taken together shall constitute the Award.


Dated: _August 10, 2011_


Connie L. Peterson


Dated: _____


Lewis A. Remele, Jr.


72

93. This Award may be executed in multiple counterparts, all of which taken together shall constitute the Award.

Dated: _____

Dated: 8/10/11    _____
Connie L. Peterson

_____
Lewis A. Remele, Jr.

72